NESENOFF & MILTENBERG, LLP
ANDREW T. MILTENBERG, Esq. (*pro hac vice* pending)
amiltenberg@nmllplaw.com
STUART BERNSTEIN, Esq. (*pro hac vice* pending)
sbernstein@nmllplaw.com
TARA J. DAVIS, Esq. (*pro hac vice* pending)
tdavis@nmllplaw.com
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone:  (212) 736-4500

HATHAWAY PARKER
MARK HATHAWAY, Esq.
mark@hathawayparker.com
JENNA E. PARKER, Esq.
jenna@hathawayparker.com
445 S. Figueroa Street, 31st Floor
Los Angeles, California 90071
Telephone: (213) 529-9000

*Attorneys for Matthew Boermeester*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MATTHEW BOERMEESTER,<br><br>          Plaintiff,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, GRETCHEN DAHLINGER MEANS, individually and in her official capacity, and Dr. AINSLEY CARRY, individually and in his official capacity,<br><br>          Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. Title IX-Erroneous Outcome<br>2. Title IX-Selective Enforcement<br>3. 14th Amendment Procedural Due Process<br>4. Breach of Contract<br>5. Promissory Estoppel<br>6. Negligence<br>7. Intentional Infliction of Emotional Distress |

COMES NOW PLAINTIFF Matthew Boermeester ("Plaintiff" or "Mr. Boermeester"), by and through his attorneys Nesenoff & Miltenberg, LLP and Hathaway Parker Inc., as and for his Complaint, respectfully alleges as follows:

## OVERVIEW OF THIS ACTION

1. Defendants the University of Southern California, Gretchen Dahlinger Means and Dr. Ainsley Carry committed an egregious miscarriage of justice against Plaintiff Matthew Boermeester, a former student and star athlete at the University of Southern California, who was expelled from the University after a third-party, non-witness filed a false report concerning an interaction between Mr. Boermeester and his girlfriend, Zoe Katz.

2. It is no secret that over the past few years, various courts including this one, have seen a substantial increase in litigation brought by male students against universities alleging a mishandling of sexual misconduct allegations and biased proceedings leading to unwarranted sanctions.

3. However, unlike the multitude of cases currently pending before various District Courts, the supposed "victim" in this matter consistently maintained, and publicly declared, that the alleged misconduct never even occurred.

4. Instead, a third-party report filed by a non-witness "Responsible Employee" led the University's Title IX office to itself initiate a complaint against Mr. Boermeester, treating the "reporting party" Zoe Katz as a "battered" woman despite her repeated denials of misconduct, and fabricating and misrepresenting evidence to reach their predetermined conclusion that Mr. Boermeester was responsible for a violation of USC's Policies and deserved the most severe form of punishment, an expulsion.

5. Throughout USC's investigation, Defendants utilized intimidation tactics and threats of adverse institutional action to continuously interfere with, and insert themselves into, the private, consensual, adult relationship between Mr. Boermeester and Ms. Katz.

6. Around midnight on the evening/early morning of January 20-21, 2017, Mr.

Boermeester and Ms. Katz returned to Ms. Katz's residence after picking up food from McDonald's. The two briefly joked around, throwing French fries at each other, and laughing in the alley by Ms. Katz's residence before going inside the building.

7.  As nothing inappropriate had occurred, Ms. Katz never made a report to USC concerning the behavior engaged in by Plaintiff.

8.  Instead, another USC student, Dylan Holt, who allegedly observed part of Ms. Katz's and Mr. Boermeester's interactions from a distance, out of his window, late at night, told another USC student, Tanner Smith, that he thought he had observed a physical altercation.

9.  In what can only be described as a game of telephone gone awry, that student, Tanner Smith, then later reported to his father what his friend Dylan Holt supposedly saw.

10. As Tanner Smith's father Peter Smith happened to be coach of the USC men's tennis team, and thus a "Responsible Employee" pursuant to USC's Title IX policy, Mr. Smith contacted the USC Title IX Office to make the one and only report made by anyone about the alleged incident between Mr. Boermeester and Ms. Katz.

11. As a result of this third-party report, and without conducting any investigation or speaking with Mr. Boermeester, on January 26, 2017, USC interim suspended Mr. Boermeester when it removed him from campus and banned him from all classes and participation on the football team. Mr. Boermeester was not provided any notice or a hearing on the alleged charges of "intimate partner violence" which resulted in him being escorted off campus, notwithstanding that both Mr. Boermeester and Ms. Katz denied at all times that any such conduct ever occurred.

12. At the time of his removal from campus, Mr. Boermeester was just two classes shy of graduation.

13. USC proceeded to conduct a biased and procedurally flawed investigation against Mr. Boermeester, predicated on unlawful gender stereotypes and motivated by a desire to demonstrate publicly the University's harsh stance against male perpetrators of sexual

1    misconduct.

2        14. Throughout its investigation, USC consistently referred to Ms. Katz as the

3    "Reporting Party" and treated her as the battered victim, even though she never made a

4    report against Mr. Boermeester and, to the contrary, consistently maintained that she did

5    not experience any prohibited conduct.

6        15. Given Mr. Boermeester's status as a male student and well-known athlete at USC,

7    Title IX Coordinator Gretchen Dahlinger Means presumed Mr. Boermeester's guilt from

8    the outset and conducted an investigation more akin to a prosecution, designed to fit the

9    narrative of what she believed had transpired.

10       16. After a five months long investigation process, during which Dahlinger Means

11   and Title IX Investigator Lauren Elan Helsper ("Helsper") investigated and prosecuted

12   Mr. Boermeester, misrepresented the testimony provided by the parties, fabricated

13   claims against Mr. Boermeester to support their innate beliefs about what had transpired

14   on the evening in question, ignored exculpatory evidence including statements from the

15   alleged "victim" herself refuting all allegations of wrongdoing, and afforded

16   unwarranted weight to the statements of hearsay witnesses, on July 7, 2017, USC

17   ordered Mr. Boermeester permanently expelled from USC.

18       17. As a result of the expulsion, Mr. Boermeester was unable to complete the two

19   classes needed to receive his degree from USC and unable to resume his role on the USC

20   football team, resulting in irreparable damage to his academic career and derailing his

21   aspirations to play for the National Football League.

22                                   **THE PARTIES**

23       18. Plaintiff Matthew Boermeester is a natural person, citizen of the United States,

24   and resident of the State of California. During the events described herein, he was a

25   student in his senior year at the University of Southern California and was a member of

26   the University of Southern California football team.

27       19. Defendant the University of Southern California ("USC" or "the University") is a

28   private research university located in Los Angeles, California.

20. Upon information and belief, Defendant Gretchen Dahlinger Means ("Dahlinger Means") is a resident of the State of California and was the Title IX Coordinator at the University of Southern California at all relevant times herein.

21. Upon information and belief, Defendant Dr. Ainsley Carry ("Dr. Carry") is a resident of the State of California and was the Vice President for Student Affairs at the University of Southern California at all relevant times herein.

## JURISDICTION AND VENUE

22. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

23. This Court has personal jurisdiction over Defendant University of Southern California on the grounds that the University is conducting business within the State of California.

24. This Court has personal jurisdiction over Defendant Gretchen Dahlinger Means on the grounds that she was employed by the University of Southern California as Title IX Coordinator at all relevant times herein.

25. This Court has personal jurisdiction over Defendant Dr. Ainsley Carrey as he was employed by the University of Southern California as Vice President for Student Affairs at all relevant times herein.

26. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. THE ALLEGED INCIDENT OF JANUARY 20-21, 2017

27. During the 2016-2017 academic year, Plaintiff Matthew Boermeester was a 22-year-old senior and full-scholarship athlete at the University of Southern California

("USC"), on track to graduate in May 2017.

28. Mr. Boermeester planned to continue attending USC during the Fall 2017 semester to work toward receiving his master's degree in a one-year entrepreneurship program while playing USC football as a graduate student.

29. During his first three and a half years at USC, Mr. Boermeester twice received the David Marks Scholar-Athlete Award, which is awarded to full-scholarship athletes who maintain a 3.0 GPA or above.

30. While excelling academically, Mr. Boermeester was also the star kicker of the USC Trojans, Division 1 football team, for which he kicked the game winning field goal to lead the Trojans to victory in the Rose Bowl on January 2, 2017.

31. As of January 21, 2017, Mr. Boermeester had been dating Zoe Katz ("Ms. Katz"), also 22 years old and a Senior at USC, for well over one year.

32. Ms. Katz was the captain of the USC women's tennis team and a nationally ranked singles player.

33. Plaintiff, a kicker on USC's football team had undergone knee surgery performed by USC doctors on January 10, 2017.

34. Around midnight on January 21, 2017, Ms. Katz picked Mr. Boermeester up in her car and drove them to McDonald's to buy food. They returned to Ms. Katz's residence, where she parked her car in the garage. They then began walking towards her residence together. During this brief walk, Mr. Boermeester and Ms. Katz joked around about Mr. Boermeester's role in USC's Rose Bowl win, threw French fries at each other, and laughed together. During this interaction, Mr. Boermeester playfully put one hand on Ms. Katz's neck, in an intimate manner. They then entered Ms. Katz's building together.

35. During this interaction, Mr. Boermeester was wearing a knee brace due to his recent surgery and his knee was particularly swollen and bruised, as evidenced by a photograph taken earlier that day during a rehabilitation session.

36. At one point during their interaction, USC student Max Brenner walked past Ms.

Katz and Mr. Boermeester to bring his garbage out to the dumpster and then walked back inside the building.

37. Not noticing anything of concern, Mr. Brenner never even turned his head towards the two of them.

38. As Ms. Katz and Mr. Boermeester entered her building, USC student Dylan Holt, who had apparently observed part of their interaction, approached them to ask if Ms. Katz was alright, to which she replied that she was fine.

39. Mr. Holt later told USC's Title IX office that he did not want to participate in the investigation and had not seen the entire interaction in the alley.

40. On the morning of January 21, 2017, sports psychologist Nohelani Lawrence called Ms. Katz to ask if she was ok, to which Ms. Katz replied that she was fine. Mr. Boermeester and Ms. Katz spent the remainder of that weekend together.

II.    **THE THIRD-PARTY REPORT**

41. Though referred to as the "Reporting Party" throughout USC's investigation, Ms. Katz never made a report to USC's Title IX office concerning Mr. Boermeester.

42. Instead, Dylan Holt, who had allegedly viewed part of the interaction through his window, told his roommate Tanner Smith what he thought he had observed.

43. Tanner Smith approached Ms. Katz that evening and noticed Ms. Katz did not seem upset by her interaction with Mr. Boermeester in the alley.

44. However, Tanner Smith later spoke to his father Peter Smith, Coach of the USC Men's Tennis team, at a team tennis practice about what Dylan Holt had told him.

45. As a Responsible Employee, Peter Smith was required to report to the USC Title IX Office what his son Tanner had told him about the alleged interaction between Mr. Boermeester and Ms. Katz.

46. According to USC's Policy, a Responsible Employee: "must immediately report all known information about suspected prohibited conduct to the Title IX Office. This includes the name of the parties and known details of the conduct. This duty applies no matter how the information is learned; whether from direct report from an affected party,

from social media, or from a concerned third party. Failure by a Responsible Employee to make a timely report of prohibited conduct may be subject to discipline, up to and including removal from their position."

47. Ms. Katz repeatedly affirmed to USC that she had not experienced any prohibited conduct. Yet, throughout the investigation USC referred to her as the "Reporting Party," demonstrating a presumption that Ms. Katz, as the female involved in the interaction, must have been a victim, a theme that was carried throughout USC's flawed and biased investigation and, ultimately lead to the erroneous decision.

## III.    THE INTERIM SUSPENSION

48. On January 23, 2017, Ms. Katz was coerced into appearing for a meeting at USC's Title IX office, under the threat of a registration hold, to meet with Dahlinger Means, Helsper, and sports psychologist Nohelani Lawrence. Ms. Katz was not made aware of the purpose of such meeting.

49. Without being notified that a third-party report had been made, or the contents of such report, Ms. Katz was directed to a room alone, and thereafter was questioned by all three women about the alleged incident, as well as her private relationship with Mr. Boermeester.

50. Dahlinger Means and Helsper took advantage of Ms. Katz's state of confusion, shock, and distress at having to answer questions about her private relationship, to manipulate her "into saying things about [Mr. Boermeester] and our relationship that were greatly exaggerated or totally untrue. In hindsight, it is now clear to me that the University had an agenda at that time and that they were using me to further that agenda." (App. Record 763-764).

51. Specifically, the Investigators took her words out of context and re-characterized them to create a narrative that was simply untrue. For instance, at no time did Ms. Katz state that she had ever sustained bruises at the hands of Mr. Boermeester; yet, this alleged statement was relied upon heavily by USC in making their determination.

52. Upon information and belief, during this meeting, Dahlinger Means referenced

Baylor University's prior mishandling of sexual assault allegations against members of its football team, stating something to the effect of "We know how to handle football players." https://www.si.com/college-football/2016/05/26/baylor-art-briles-sexual-assault-ken-starr

53. Ms. Katz did not learn until many weeks later, while being allowed to review the Investigators' summary of her "statement" for the first time at the Evidence Review, that her words had been substantially mischaracterized and taken out of context, and that her "statement" included words used by Dahlinger Means rather than Ms. Katz herself.

54. Dahlinger Means also subjected Ms. Katz to a physical examination of her legs, arms, neck and head, to determine if she had sustained any bruises at the hands of Mr. Boermeester. Though Dahlinger Means found that Ms. Katz had not been harmed in any way, she failed to document and disclose this critical piece of information in the investigation record. Unbeknownst to Ms. Katz at the time, this meeting was ultimately treated by Dahlinger Means as an intake interview for a formal complaint against Mr. Boermeester.

55. On January 24, 2017, Ms. Katz contacted Helsper to reaffirm that she did not want USC to conduct an investigation against Mr. Boermeester, as nothing improper had occurred. Helsper disregarded her requests and instructed Ms. Katz not to speak with Mr. Boermeester about the matter as such actions could be deemed a breach of confidentiality and thus a violation of USC's policies.

56. On January 26, 2017, Mr. Boermeester received a letter from Assistant Vice Provost for Student Affairs Lynette S. Merriman, dated January 25, 2017, notifying him that "[t]he Office of the Vice President for Student Affairs has placed you on interim suspension pending administrative review of a Title IX investigation."

57. Also on January 26, 2017, Mr. Boermeester received from Ms. Merriman an Avoidance of Contact Order ("AOC Order"), prohibiting all forms of contact with his girlfriend, Ms. Katz. The AOC Order was implemented against the clear wishes of Mr. Boermeester and Ms. Katz.

58. In a clear abuse of power, USC refused to lift the AOC Order despite repeated requests from both parties and their counsel, raising the discriminatory justification that it was necessary to keep Ms. Katz "safe" from Mr. Boermeester.

59. This supposed need to protect Ms. Katz from Mr. Boermeester strains credulity given Ms. Katz voluntarily drove down to San Diego on her own, often more than once per week, to spend time with Mr. Boermeester while he resided at home during the interim suspension.

60. On January 26, 2017, Mr. Boermeester received a notice from Dahlinger Means indicating a report was received alleging he violated USC's provisions on Intimate Partner Violence.

61. Despite the lack of any prior disciplinary history, prior to meeting or speaking with Mr. Boermeester, and prior to conducting any investigation whatsoever, Mr. Boermeester was escorted off campus on January 26, 2017.

62. This "interim suspension" was a *de facto* expulsion in that Mr. Boermeester was excluded from all classes, seminars and university programs, was not permitted any involvement with organized football team functions including practice, games, or training, was banned from all University sponsored activities, and was banned from all USC facilities which prevented him from receiving the medical treatment and rehabilitative care necessary for the recovery from his knee surgery performed by USC doctors on January 10, 2017.

## IV.   USC POLICIES AND PROCEDURES

63. The policies applicable to USC's investigation of Title IX complaints during the relevant timeframe were the SCampus Handbook 2016-2017 (the "Handbook") and the Policy and Procedures on Student Sexual, Interpersonal, and Protected Class Misconduct ("Misconduct Policy") (collectively, the "Policies").

64. The Policies guaranteed a "fair, thorough, reliable, neutral and impartial investigation by a trained and experienced investigator." USC, however, provides no information regarding the training and experience of its investigators.

65. ATIXA, the leading entity providing training to Title IX investigators nationally provides training courses that offer certification as a "civil rights investigator" in merely two days. https://atixa.org/events/training-and-certification/#levelone

66. Utilizing the single or dual investigative model, USC's Policies deprive an accused of a hearing before an impartial panel and instead permit one or two single, unlicensed individuals within the Title IX Office, with undisclosed qualifications and experience, to act as prosecutor, judge and jury.

67. This convergence of roles creates substantial conflicts of interest that allow a single individual to direct the ultimate outcome of the matter based on her[1] personal presumptions about the veracity of the allegations and influenced by her innate beliefs about the roles of males and females in sexual interactions.

68. Moreover, this investigative model deprives an accused student of a full and meaningful opportunity to be heard as he is denied the opportunity to present his defense before an impartial panel of decision makers, to cross examine his accuser (whether or not the reporting party is the alleged victim) and to challenge the evidence or witnesses who, per the Title IX Office, offered adverse testimony against him.

69. Notably, in cases of alleged academic violations, USC's policies provide for a formal hearing including a three-member hearing panel, an opportunity to present and rebut evidence, an opportunity to present and question witnesses, and the right to request that witnesses affirm their testimony is truthful. None of these procedural protections were afforded to Mr. Boermeester despite the severe and lifelong ramifications of a finding of responsibility for intimate partner violence.

70. In contrast to USC's policies, California courts have consistently recognized that students must have "ample opportunity to hear and observe the witnesses against them." *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 246.

71. The significance of this right was recently articulated by the California Court of

---

[1] The pronoun "her" is used in this instance as all Title IX investigators at USC during the relevant timeframe were female.

Appeals, Second Circuit:

> "A decision relating to the misconduct of a student requires a factual determination as to whether the conduct took place or not. The accuracy of that determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause. Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, cross–examination has always been considered a most effective way to ascertain truth. The ability to cross–examine is most critical when the issue is the credibility of the accuser. Cross–examination takes aim at credibility like no other procedural device. A cross-examiner may delve into the witness' story to test the witness' perceptions and memory. He may expose testimonial infirmities such as forgetfulness, confusion, or evasion ... thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony. He may reveal possible biases, prejudices, or ulterior motives' that color the witness's testimony…Whatever the outcome, 'the greatest legal engine ever invented for the discovery of truth' will do what it is meant to: permit the [fact finder] that is to decide the [litigant]'s fate to observe the demeanor of the witness in making his statement, thus aiding the [fact finder] in assessing his credibility."

> *Doe v. Allee* (2019) 30 Cal.App.5th 1036, at *18 (*Allee*) (internal citations and quotations omitted).

72. Moreover, USC uses the trauma informed investigation model when investigating complaints, which teaches that trauma causes responses in victims that may be counterintuitive; for instance, continued contact with the perpetrator, delayed response to trauma, flat affect, or use of humor. It discusses that "survivors" do not act in any one way but responses can vary as there are a variety of coping mechanisms. Consequently, statements denying that any trauma occurred could be construed as a direct response to the trauma suffered.

73. Here, the Investigators used this trauma informed method in presuming Mr.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12

Boermeester to have engaged in the alleged misconduct, and to explain away Ms. Katz's assertions that nothing improper occurred.

## V.  USC FAILED TO CONDUCT AN IMPARTIAL AND THOROUGH INVESTIGATION.

74. After receiving the notice of investigation, Mr. Boermeester contacted the Title IX office and requested that his meeting take place as soon as possible so that he could resume his academics. The initial meeting was scheduled for January 30, 2017.

75. On January 27, 2017, USC changed Mr. Boermeester's financial account with the University by removing his scholarship for tuition and by personally charging him 2017 Spring tuition for the classes he had just been barred from attending.  As a result, he received a "financial hold" on his transcript and later received F's in those classes.

76. On or about January 28, 2017, USC obtained surveillance video footage from the location of the alleged incident which captured Mr. Boermeester and Ms. Katz's interaction from the evening in question.

77. On January 30, 2017, Mr. Boermeester met with Title IX Investigator Lauren Elan Helsper. At the beginning of the meeting, Helsper referred to Mr. Boermeester as an "all-star football player" and stated that his status as such would play no role in the Title IX process.

78. Helsper proceeded to inform Mr. Boermeester of his rights as a "Respondent" under USC's Student Conduct Code, including the presumption of innocence, and the guarantee that the Title IX office would conduct a "fair, thorough, neutral and impartial investigation" of the incident.

79. Helsper described the usual Title IX process but confirmed that the reported victim was not the "Reporting Party" as described in the process.

80. She indicated that Mr. Boermeester could have an advisor of his choice, but that the advisor could only assist him with understanding the process and could not speak or disrupt the investigation.

81. Helsper then proceeded to ask about the events of January 20-21, 2017.  Mr.

Boermeester denied he had engaged in any "intimate partner violence" or any conduct that harmed Ms. Katz in any way.  Mr. Boermeester described the events of the day and evening of the incident, and described the context of his interactions with Ms. Katz in the alley as what they were - simply playing around with each other. He noted that they spent the remainder of the weekend together. Mr. Boermeester offered the names of two witnesses who had been with him less than one hour before the alleged incident, in addition to Ms. Katz, to support his account.

82. Curiously, not only did the Investigators fail to interview these two witnesses, but they also omitted from their report that Mr. Boermeester had identified any witnesses at all.

83. Helsper questioned Mr. Boermeester about the events of January 21, 2017, and proceeded to ask inappropriate, wholly irrelevant and highly personal questions concerning his sexual relationship with Ms. Katz, seemingly in an attempt to cultivate further potential charges to bring against him.

84. At no time during this meeting did the Investigators notify Mr. Boermeester that they had obtained video surveillance footage capturing his interactions with Ms. Katz, nor did they question him about what transpired in the video.

85. Helsper concluded the meeting by advising Mr. Boermeester that he could be charged with additional violations if he contacted witnesses, as that could be viewed as retaliation, or otherwise interfere in the investigation. Demonstrating her inexperience, when Mr. Boermeester asked how he could modify the interim suspension, Helsper stated she had to call Dahlinger Means to find out.

86. Mr. Boermeester was never interviewed again.

87. On January 30, 2017, after his meeting with Helsper, Mr. Boermeester requested that Dr. Carry lift or modify the suspension so that he and Ms. Katz could see each other, on the grounds that the interim measure was preventing him from receiving rehabilitative care for his recent knee surgery, preventing him from attending classes needed to graduate in May 2017, and his inability to graduate on time could affect his

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

14

final season of football eligibility.

88. On January 30, 2017, shortly after Mr. Boermeester's meeting, Ms. Katz met with Investigator Helsper and reiterated her desire that no investigation take place. She also requested that the AOC Order be lifted, a request that Helsper had to run by Dahlinger Means.

89. Also during this meeting, Ms. Katz was informed that the Title IX office had obtained from the Department of Public Safety, video surveillance footage from the evening at issue. Ms. Katz asked to view the footage and again, Helsper had to call Dahlinger Means to check on this request, which Dahlinger Means denied. However, Ms. Katz was instructed to return for another meeting on February 2, 2017 where she could go over the video "frame by frame" with Dahlinger Means.

90. However, when Ms. Katz appeared for the follow up meeting on February 2, Dahlinger Means instead aggressively questioned Ms. Katz about why her account allegedly did not match up with what Dahlinger Means falsely stated was depicted in the video footage. Ms. Katz was never permitted to view the video or otherwise respond to Dahlinger Mean's claims. Incredibly, this meeting was never documented nor referenced in the investigative file.

91. When Mr. Boermeester subsequently requested, through his attorney, that he be permitted to view the video footage, Dahlinger Means accusatorily questioned how he would know that such a video existed unless he had been speaking with Ms. Katz, in direct violation of the AOC Order. Though the Investigators ultimately relied heavily on their own interpretation of the video footage as objective evidence corroborative of the allegations, neither Mr. Boermeester nor Ms. Katz were ever questioned about the video.

92. After Ms. Katz's February 2, 2017 meeting, Ms. Katz's advisor Ms. Lawrence indicated that Dahlinger Means was not going to listen to Ms. Katz, and suggested she consider retaining an attorney to protect her rights.

93. In the meantime, on January 31, 2017, Dr. Carry arbitrarily denied Mr. Boermeester's request, upholding the interim suspension and Avoidance of Contact

1   Order as written, with no consideration of alternative options such as taking on-line

2   classes or receiving ongoing medical treatment for his knee.

3       94.In a clear abuse of power, USC inappropriately inserted itself into a private,

4   consensual adult relationship when it imposed this AOC Order on Mr. Boermeester,

5   prohibiting him from having any contact with Ms. Katz, either "directly or indirectly by

6   any means" against the wishes of both parties, and without any basis for doing so

7   beyond the report of a "Responsible Employee" who lacked any personal or first-hand

8   knowledge about the unfounded allegations.

9       95.Despite the repeated requests from both parties to lift the AOC Order, both

10  directly and through their respective counsel, it remained in effect for the duration of the

11  Title IX process with no opportunity for the parties to contest it.

12      96.As the parties continued to spend time together on their own free will, Mr.

13  Boermeester was later charged with violating the AOC Order when Ms. Katz traveled to

14  his family home in San Diego to be with him.

15      97.On February 7, 2017, the existence of an investigation against Mr. Boermeester

16  was leaked to the media. USC issued a public press release in response, stating Mr.

17  Boermeester had been removed from the USC football team and had been indefinitely

18  suspended during the investigation. *See* https://deadspin.com/usc-trojans-suspend-

19  kicker-under-investigation-for-cod-1792096982

20      98.That same day, distraught over the Title IX Office's actions, Ms. Katz wrote a

21  statement on Twitter, indicating that she was the person involved and that the report

22  about Mr. Boermeester was false.

23      99.The following day, February 8, 2017, Ms. Katz was ordered to another meeting

24  with the Title IX office. Ms. Katz was accompanied to this meeting by her father, a

25  professor at USC. Ms. Katz reiterated, along with her father, that she was safe and did

26  not require any protection from Mr. Boermeester.

27      100.  Helsper interrogated Ms. Katz about her tweet of February 7, and reiterated

28  Dahlinger Means' threats of institutional action against her if she discussed the

---

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  investigation.

2  101.  On February 14, 2017, Helsper issued to Mr. Boermeester a second charge for

3  allegedly violating the AOC Order, while Mr. Boermeester and Ms. Katz were together

4  celebrating Valentine's Day.

5  102.  On or about March 22, 2017, instead of appearing in person at the "Evidence

6  Hearing"[2] scheduled by Helsper for her as the "Reporting Party" in this matter, Ms. Katz

7  submitted a written statement that denied Mr. Boermeester engaged in any prohibited

8  conduct on January 21, 2017, or at any other time.

9  103.  On or about March 22, 2017, Mr. Boermeester likewise submitted a written

10  statement in lieu of appearing in person for his separate "Evidence Hearing," affirming

11  that the alleged prohibited conduct of January 21, 2017 never occurred.

12  104.  On April 27, 2017, Dahlinger Means and Helsper issued their Summary

13  Administrative Review, in which they concluded that Mr. Boermeester violated USC's

14  Policy sections VI.E. Intimate Partner Violence, and VI.G. Violation of an Interim

15  Measure (for his failure to abide by the Avoidance of Contact Order).

16  105.  Thereafter, the Title IX Office forwarded its Summary Administrative Review

17  to the Misconduct Sanctioning panel, whose role was to determine the appropriate

18  sanction(s) based on the findings of the Title IX Office.

19  106.  The Panel was composed of two staff or faculty members appointed by Michael

20  Quick, Provost and Senior Vice President for Academic Affairs, and one student of the

21  University.

22  107.  Though USC's Policies do not provide for anonymity in the sanctioning

23  process, the identities of the three members of the Misconduct Sanctioning Panel were

24  kept confidential. Thus, Mr. Boermeester was unable to challenge the participation of

25
26  [2] The "Evidence Hearing" is far from a formal hearing as its name would suggest. It is
instead simply separate meetings held between each party and Title IX personnel, during
27  which each party may respond in in writing to the evidence they are permitted to review
in the Title IX Office. There is no independent hearing panel, no opportunity to question
28  a reporting party, and no opportunity to challenge witnesses.

1   any particular individual based on conflicts of interest or bias.

2        108.   Demonstrating the absence of any independent level of review, Dahlinger

3   Means was responsible for training the members of the Misconduct Sanctioning Panel

4   twice per year.

5        109.   Additionally, she attended the meetings and deliberations of the Misconduct

6   Sanctioning Panel but allegedly did not submit a vote when deciding on the sanctions to

7   be imposed.

8        110.   The Misconduct Sanctioning Panel may not reassess or re-evaluate the findings

9   of fact and conclusions of policy violation found by the Title IX Office.

10       111.   The week prior to Mr. Boermeester's anticipated graduation date, on May 2,

11   2017, the Misconduct Sanctioning Panel met and accepted without question the findings

12   of the Investigators, and concluded that the expulsion of Mr. Boermeester was

13   warranted.

14       112.   Subsequent to the issuance of the Misconduct Sanctioning Panel's decision, Mr.

15   Boermeester was afforded one final avenue of appeal within USC's process, to the

16   Appellate Panel.

17       113.   Similar to the Misconduct Sanctioning Panel, the Appellate Panel was

18   composed of three unidentified individuals, at least one of whom was a faculty member

19   appointed by Dr. Carry.

20       114.   Dahlinger Means was also responsible for the training of the Appellate Panel

21   members.

22       115.   Establishing the Appellate Panel's authority as a mere rubber stamp on the Title

23   IX Coordinator's decision, the Appellate Panel is required to "defer to the Title IX

24   Office and Misconduct Sanctioning Panel" in making its recommended findings to Dr.

25   Carry, who has unfettered discretion to modify or accept this decision.

26       116.   Both Mr. Boermeester and Ms. Katz submitted appeals, challenging the

27   findings and seeking to overturn the sanction.

28       117.   The Appellate Panel denied Mr. Boermeester's appeal but recommended a

reduction in sanction from expulsion to a two-year suspension, finding that the sanction of expulsion was "grossly disproportionate" to the violations found by the Title IX Office.

118.   On July 7, 2017, Dr. Carry approved the findings of the Title IX Investigator and Appellate Panel concerning the two violations of USC's Policies. However, Dr. Carry rejected the recommendation of the Appellate Panel to reduce the sanction to a two-year suspension and, instead, arbitrarily increased the sanction to an expulsion, stating: "Whether you intended to cause the Reporting Party harm or did so recklessly, expulsion is appropriate given the nature of the harm inflicted upon the Reporting Party, as well as your violation of the University's Avoidance of Contact order."

119.   Dr. Carry's explanation for the finding was fatally flawed as Mr. Boermeester did not, and had never, caused any harm to Ms. Katz.

120.   Dr. Carry also cited to Mr. Boermeester's "high profile" status as a factor justifying the expulsion.

121.   In direct violation of its obligations with respect to Mr. Boermeester's privacy and confidentiality in the Title IX process, USC publicly announced shortly after Dr. Carry's findings: "Placekicker Matt Boermeester, whose 18 field goals last year- including a 46-yarder at the gun to win the Rose Bowl- were 1 shy of the school record, won't return because of a student code of conduct issue." https://s3.amazonaws.com/sidearm.sites/usctrojans.com/documents/2017/7/25/17prenotes_fb.pdf; https://collegefootballtalk.nbcsports.com/2017/07/26/usc-confirms-k-matt-boermeester-wont-return-to-trojans/comment-page-1/#comments

122.   On July 30, 2017, after USC's Title IX process had concluded, Ms. Katz issued a public statement concerning the mistreatment she had endured at the hands of Dahlinger Means and Helsper through their investigation process. (App. Record 415-416). A true and complete copy of this statement is attached hereto as Exhibit A.

123.   Among other things, Ms. Katz declared:

- "I want to be very clear that I have never been abused, assaulted or otherwise mistreated by Matt. He is an incredible person, and I am and have been 100% behind him. Nothing happened that warranted an investigation, much less the unfair, biased and drawn out process that we have been forced to endure quietly."

- "Words, including mine, have been incompetently or intentionally misrepresented, misquoted and taken out of context, which should not be that surprising since no statements were recorded or verified."

- "When I told the truth about Matt, in repeated interrogations, I was stereotyped and was told I must be a "battered" woman, and that made me feel demeaned and absurdly profiled."

- "I feel I was misled, harassed, threatened and discriminated against by the Title IX office to such an extent that I had to retain my own attorney during the process to protect myself and to try to get them to listen to me. The Title IX office's response was dismissive and demeaning, 'We are sorry you feel that way'."

- "Looking back, Matt never had a chance."

- "I was also told that I could be charged and investigated if I spoke to anyone who they decided to call in as possible "witnesses"."

- "Matt Boermeester did nothing improper against me, ever. I would not stand for it."

## VI.    PROCEDURAL HISTORY OF THIS CASE.

124.  On August 11, 2017, Plaintiff timely filed a Petition for Writ of Mandamus in the Superior Court of the State of California for the County of Los Angeles, Central District (Case No. BS 170473) pursuant to California Code Civ. Proc. § 1094.5, against

the University of Southern California and Vice President for Student Affairs Dr. Ainsley Carry[3].

125.   In his Petition, Plaintiff sought to reverse his expulsion on the grounds that USC failed to grant him a fair hearing, failed to proceed in the manner required by law, and committed a prejudicial abuse of discretion in that the decision was not supported by the evidence.

126.   However, Plaintiff's Petition was ultimately denied on March 21, 2018 by the Honorable Judge Amy Hogue of the Superior Court for the State of California.

127.   Subsequently, on June 14, 2018, Plaintiff filed a notice of appeal with the Court of Appeals of the State of California Second Appellate District. The Second Appellate District has not yet heard oral arguments or received briefing from the parties.

128.   Accordingly, Plaintiff has now exhausted his judicial remedies in State court and his federal action is properly before this Court and ripe for review.

## VII.   THE FINDINGS AND SANCTION WERE MOTIVATED BY GENDER BIAS.

129.   USC's Policies permit the Vice President for Student Affairs to initiate a review of an alleged violation on behalf of the University, when the alleged violation affects the "well-being of the campus or the personal safety or well-being of any member of the university community." (Handbook, pg. 33)

130.   USC's Policies also specify that a "reporting party" has the right to "decide whether or not they want to pursue a formal Title IX investigation." In limited circumstances, the Title IX Office may initiate an investigation against the reporting party's wishes- specifically, when "an incident involves a weapon or predatory drug use, when multiple victims are involved, or when there is a danger to the greater community," none of which were present here. (Misconduct Policy, p. 5)

---

[3] Dr. Carry was Vice President for Student Affairs at Auburn University where he was responsible for the wrongful expulsion of Joshua Strange, a falsely accused male student who was ultimately cleared of sexual misconduct.

131.   Notwithstanding, against the express wishes of Ms. Katz, USC opened an investigation into the allegations against Mr. Boermeester, with Ms. Katz identified as the named complainant.

132.   USC initiated and conducted an investigation informed by archaic stereotypes and innate biases that male athletes, including Mr. Boermeester, are predisposed to be aggressive, violent and hypermasculine.

133.   Dahlinger Means utilized intimidation tactics and the threat of additional institutional action against both Mr. Boermeester and Ms. Katz to prevent them from speaking with each other, speaking with potential witnesses, or speaking about this matter in any capacity, thus depriving Mr. Boermeester of a full and fair opportunity to defend himself.

134.   Dahlinger Means directed an investigation calculated to lead to the foregone conclusion that Mr. Boermeester was guilty of the misconduct alleged.

135.   From the outset, Mr. Boermeester was treated as a perpetrator, while Ms. Katz was mischaracterized as a "battered woman" whose repeated denials of any wrongdoing by Mr. Boermeester were disregarded.

136.   In fact, convinced that Ms. Katz must be a victim despite her assertions to the contrary, USC required her to attend counseling by threatening to prohibit her from attending tennis team practices if she did not do so.

137.   Throughout the investigation, Ms. Katz repeatedly told USC Title IX personnel, including Dahlinger Means and Helsper, that Mr. Boermeester was falsely accused of misconduct.

138.   In response, Dahlinger Means and Helsper told Ms. Katz that she would be investigated for interfering with their investigation if she continued to speak out in support of Mr. Boermeester, effectively limiting Mr. Boermeester's ability to present a meaningful defense as Ms. Katz was the only other person present for the entirety of the relevant interaction.

139.   Dahlinger Means directed a prosecutorial investigation informed by her prior

position as a prosecutor within the San Diego District Attorney's Office's Sex Crimes Unit. In that role, she handled cases involving sexual assault, sex-based homicides, and criminal sexual exploitation. She also participated in a variety of state and federal tasks forces dedicated to combating criminal sexual exploitation and helped form a county-wide group on the topic. She developed and facilitated annual training on sexual assault prosecution, and taught internationally on sexual assault and criminal sexual exploitation. Further, in 2013, she was recruited by the U.S. Marine Corps where she became an expert in sexual assault and complex litigation, developed sexual assault protocol and trained and mentored prosecutors.

140.  Since arriving at USC in January 2016, Dahlinger Means has received her share of negative criticism, both internally within USC, as well as externally from the national media and press.

141.  In a matter titled *Doe v. Ainsley Carry, et al.* which was brought in the Los Angeles Superior Court under Case number BS 163736, Dahlinger Means acknowledged that she and co-investigator Patrick Noonan referred to an accused male student and his advisor as "motherfuckers", questioning "Who do those motherfuckers think they are?" and "Does that college motherfucker know who I am?" while describing the female complainant as "cute" and "a catch", after they mistakenly thought a phone call with the accused and his attorney had concluded.

142.  In ordering USC to vacate the findings issued and pay back $111,965 in attorneys' fees to the plaintiff, Judge Elizabeth Allen White found the statements made by Dahlinger Means and Noonan demonstrated "an unacceptable probability of actual bias in the manner in which the hearing was conducted" and concluded Dahlinger Means "held an adversarial position in relation to Petitioner, rendering her advisory role…improper." Doe v. Ainsley Carry, et al., Case No. BS163736 (Superior Court, California, Los Angeles County) (June 28, 2018)

143.  Judge White further concluded that under USC's Student Conduct Code, the review panel is far from an independent decision-making body; instead, it is "merely a

proxy for the Title IX Office, which actually rendered the underlying decision."

144.  Judge White noted the impact such findings would have on future cases brought against USC by similarly situated individuals, declaring "such institutional bias exists, which will confer a benefit upon the class of persons at USC accused of violating USC's sexual misconduct policy where a Title IX investigation is conducted."

145.  USC's Title IX process, which spanned from approximately January 22, 2017 through July 7, 2017, included interviews with Mr. Boermeester, Ms. Katz, Dylan Holt, and Max Brenner, the sole percipient witnesses to the alleged incident, as well as fourteen (14) other witnesses, none of whom had any first-hand knowledge concerning the events of the evening of January 21, 2017, and some of whom did not know and had never even met Mr. Boermeester.

146.  Contrarily, witnesses identified by Mr. Boermeester who had first-hand knowledge of events taking place in the hours immediately preceding the incident were never contacted or interviewed by the Title IX office.

147.  The interviews were conducted by Investigator Helsper, under the direct supervision of Dahlinger Means, who also collected and selected screenshots of text messages, emails, an audio recording and surveillance footage from the alleyway where the interaction took place.

148.  Because Dahlinger Means and Helsper did not audio or otherwise record the witness interviews, there is no transcription of the exact questions posed by the Investigators, how they were posed (mostly leading questions), or the responses provided by witnesses. Instead, Helsper prepared summaries of the witness interviews, which were never reviewed or verified by the witnesses themselves to ensure accuracy.

149.  As Mr. Boermeester was not permitted to question the witnesses during a hearing, he was unable to confirm or refute the accuracy of witness statements as prepared and presented by the Investigators, even when a number of the witnesses admitted to having felt "manipulated and ambushed by the University" and "pressured by the University to say certain things about [Mr. Boermeester] and about [Mr.

Boermeester and Ms. Katz's relationship]."

150.  Moreover, USC prohibits an accused from receiving a physical copy of the evidence collected during the investigation. Instead, Mr. Boermeester was required to review the evidence in person at the Title IX office, after being required to relinquish his cell phone, where he was allowed only to take notes of the interview summaries and other materials gathered and included by the Investigators.

151.  Even more egregious, USC explicitly prohibits respondents from being represented by an attorney during the Title IX process. Despite the severity of the charges and potential legal and lifelong implications to an accused, an attorney may only serve as an advisor, offering support and assistance in navigating the disciplinary process. USC's policy specifically states, "The advisor is not an advocate." (Misconduct Policy, p. 12)

152.  Instead of a formal hearing process conducted by an impartial adjudicator, USC's Title IX office holds what it terms "Evidence Hearings." During the respective "Evidence Hearings," which are simply meetings with the Title IX Coordinator and Investigator, Dahlinger Means and Helsper meet with each party separately, and allow him or her to respond either orally or in writing to the evidence that they are permitted to review in the Title IX office. The Reporting and Responding Parties are also permitted to respond to written questions submitted by the other party prior to the Evidence Hearing, at the discretion of Dahlinger Means. There is no "hearing" process where, as here, there is a third-party reporting individual and the absence of a "Reporting Party."

153.  While claiming to be committed to a fair resolution of disciplinary matters, USC's Policies prohibit an accused from questioning the accuser and other witnesses.

154.  USC's policies afford great deference to the Investigator in determining what evidence to consider in forming her findings of fact. After the separate "Evidence Hearings," the Title IX Coordinator and Investigator make a decision, based upon the Investigators' findings of fact, as to whether the respondent violated the University's policies.

155.   Significantly, USC's Policies do not allow for a finding of non-responsibility against the respondent. After the Evidence Review and "Hearings" conclude, the Title IX Office is required to prepare a Summary Administrative Review which includes findings of fact, leading to one of two possible outcomes: responsible (which results in a review by the Misconduct Sanctioning Panel) or insufficient evidence (which "does not mean a Respondent is found not responsible" and may be directly appealed to the Appellate Panel for reconsideration). (Misconduct Policy, p. 16)

156.   Defendants chose to make an example of Mr. Boermeester, to demonstrate publicly the University's harsh stance against male students, particularly athletes, accused of misconduct.

## AS AND FOR A FIRST CAUSE OF ACTION

## Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* - Erroneous Outcome

## (Against University of Southern California)

157.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

158.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

159.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant USC.

160.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of

Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[4]

161.   In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

162.   According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "*[accord] due process to both parties involved...*"[5]

163.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

    a.   "Notice . . . of the procedure, including where complaints may be filed";

    b.   "Application of the procedure to complaints alleging [sexual] harassment...";

    c.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

    d.   "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

    e.   "Notice to the parties of the outcome of the complaint......"[6]

164.   A school also has an obligation under Title IX to ensure that all employees involved in the investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"[7]

---

[4] See generally U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (2001) at 19-20, 21 & nn. 98-101

[5] *Id.* at 22 (emphasis added).

[6] *Id.* at 20.

[7] *Id.* at 21.

165.  Further, Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.

166.  Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

167.  Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

168.  To succeed on an erroneous outcome claim, a plaintiff must demonstrate that there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff; and (3) specific circumstances suggesting gender bias led to the erroneous outcome.

169.  An "erroneous outcome" occurred in Plaintiff's case. Mr. Boermeester was innocent and wrongly found to have committed a violation of USC's policies, and gender bias was a motivating factor.

170.  USC failed to conduct an adequate, reliable, and impartial investigation of the third-party complaint made against Mr. Boermeester, which was filed by a non-witness Responsible Employee and not by the alleged victim herself.

171.  Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Mr. Boermeester. These circumstances include, without limitation:

i.    USC decided to pursue an investigation against Mr. Boermeester after receiving a third-party complaint from a non-witness mandated reporter, and despite the alleged victim repeatedly affirming that Mr. Boermeester did not engage in any misconduct on the evening of the alleged incident, or at any other time;

ii.   USC presumed Mr. Boermeester guilty from the outset when it imposed an interim suspension, prior to meeting or speaking with him, which precluded him from attending classes during his final semester at USC, removed him from the football team, and prevented him from receiving rehabilitative care for his recent knee surgery performed by USC doctors;

iii.  USC presumed Mr. Boermeester guilty from the outset when it removed his tuition scholarship from his financial account and charged him, personally, for the classes it barred him from attending;

iv.   USC deprived Mr. Boermeester of a meaningful opportunity to be heard when its policies did not allow for a hearing before a panel of impartial decisionmakers;

v.    USC deprived Mr. Boermeester of the opportunity to challenge and question adverse witnesses despite the Investigators' reliance on various non-party witness statements;

vi.   USC did not attempt to contact or interview witnesses identified by Mr. Boermeester but instead relied on witnesses who had no independent knowledge of the events at issue or the parties' relationship;

vii.  USC treated Ms. Katz as a "battered woman" whose repeated and vehement denials that Mr. Boermeester had engaged in any wrongdoing were disregarded on the assumption that such denials were a response to the trauma she had endured;

viii. USC referred to Mr. Boermeester as an "all-star football player" and told Ms. Katz that a "Baylor situation" was not going to happen at USC and they (at the Title IX office) knew "how to deal with football players;"

ix.   USC imposed an Avoidance of Contact Order that neither party desired, using the discriminatory justification that it needed to keep Ms. Katz "safe" from Mr. Boermeester, and failed to consider lifting it despite the requests from both parties and their counsel;

x.   USC failed to document and excluded from evidence the exculpatory evidence of Dahlinger Means' physical examination of Ms. Katz that revealed no sign of any injury;

xi.   USC failed to consider additional exculpatory evidence including the testimony of both Mr. Boermeester and Ms. Katz, security camera footage which demonstrated the absence of any wrongdoing, the testimony of multiple witnesses who reported they never saw any act of violence between the parties and that they were often physical in a playful, intimate way;

xii.   Defendants included in the Summary Administrative Review inculpatory evidence purportedly provided by Witness L.M., even though the Investigators *never* actually spoke with L.M.

xiii.   USC improperly afforded greater weight to the hearsay testimony of witnesses, who had no independent knowledge of the alleged interaction, than to the involved parties themselves; and

xiv.   USC arbitrarily increased the recommended sanction of suspension issued by the Misconduct Sanctioning Panel to a permanent dismissal, which was not subject to a further internal appeal.

172.   Upon information and belief, USC receives approximately $500 million annually in federal funding. OCR's threatened de-funding penalties for failure to comply with Title IX puts tremendous pressure on universities, including USC, to aggressively prosecute male students accused of sexual misconduct.

173.   In addition to these threatened monetary penalties, USC was under immense pressure, from both the federal government and its own student body, to aggressively handle sexual misconduct related allegations.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

174.  On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

175.  The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the

176.  report characterized as a social problem of critical importance. *See* http://www.npr.org /templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural adherence to the sexual aggressor role.

177.  The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding

1  certain forms of alternative dispute resolution.

2  178.  On April 29, 2014, OCR issued additional directives to colleges and

3  universities in the form of a guidance document titled *Questions and Answers on Title IX*

4  *and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual

5  misconduct policies, including the procedures colleges and universities "must" employ

6  "to prevent sexual violence and resolve complaints" and the elements that "should be

7  included in a school's procedures for responding to complaints of sexual violence."

8  Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach,

9  advising, for example, that hearings should be "conducted in a manner that does not

10  inflict additional trauma on the complainant." *Id.* at p. 31. While the Q&A advised that

11  "the rights established under Title IX must be interpreted consistently with any federally

12  guaranteed due process rights…a school should ensure that any due process rights do not

13  restrict or unnecessarily delay the protections provided by Title IX to the complainant."

14  *Id.* at p. 13.

15  179.  In April 2014, the White House issued a report entitled "Not Alone", which

16  included a warning that if the OCR finds that a Title IX violation occurred, the "school

17  risks losing federal funds" and that the Department of Justice ("DOJ") shares authority

18  with OCR for enforcing Title IX and may initiate an investigation or compliance review

19  of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate

20  litigation.

21  180.  In June 2014, then Assistant Secretary of Education Catherine Lhamon testified

22  before the United States Senate that if OCR could not secure voluntary compliance with

23  the DCL from a college or university, it may elect to initiate an administrative action to

24  terminate federal funds or refer the case to the Department of Justice. To support

25  enforcement of the DCL the OCR hired hundreds of additional investigators. To date,

26  OCR has resolved 193 investigations of colleges for the potential mishandling of

27  complaints of sexual violence, while 309 cases remain open.

28  https://projects.chronicle.com/titleix/

181.  In 2015, USC took part in a national sexual assault campus climate survey organized by the Association of American Universities. The results, released in September 2015, revealed that 29.7 percent of females at USC reported being a victim of sexual assault or misconduct since their enrollment.

https://dailytrojan.com/2015/09/21/usc-releases-campus-climate-survey-29-7-female-undergrads-report-sexual-misconduct/

182.  While investigating the allegations against Mr. Boermeester, USC was under investigation by OCR for its alleged mishandling of sexual misconduct complaints.

183.  In May 2013, the Student Coalition Against Rape-a group started by a USC student who gained widespread attention for blogging about her alleged rapist- filed a group complaint with the Department of Education on behalf of a number of students and staff members against USC for reported violations of Title IX and the Clery Act.

184.  Subsequently, on or about March 9, 2016, OCR received another complaint against the University, filed by an individual raising similar allegations.

185.  The investigation by OCR prompted a great deal of publicity and media attention surrounding USC's alleged mishandling of sexual misconduct complaints.

186.  On March 12, 2018, USC entered into a Voluntary Resolution Agreement with the Office for Civil Rights which concluded its review of the complaints filed against USC and indicated it would monitor the University's implementation of the Agreement until it was in full compliance with the applicable statutes and regulations.

187.  On June 11, 2018, OCR initiated a new Title IX "systemic investigation" into USC's handling of reports of sexual harassment against former employee Dr. George Tyndall, in response to complaints of sexual harassment made against Dr. Tyndall, dating back to 1990. USC did not disclose these allegations to OCR during its prior investigation into USC's handling of sexual assault complaints.

188.  Notably, while claiming to have a zero-tolerance policy for sexual assault violations, Dr. Carry orchestrated a severance deal with Dr. Tyndall, on the condition that he agree to resign. https://dailytrojan.com/2017/04/25/four-years-later-usc-remains-

under-title-ix-investigation/; https://www.latimes.com/local/ california/la-me-usc-doctor-misconduct-complaints-20180515-story.html

189.  Since the initiation of the OCR complaints and investigation into USC's handling of sexual assault claims, USC has perpetuated an anti-male atmosphere in which male students are treated as perpetrators who must be severely disciplined regardless of their guilt or innocence, and female complainants are equated to "victims" and "survivors" that must receive preferential treatment and validation.

190.  This pervasive atmosphere of anti-male bias at USC has resulted in an unprecedented amount of litigation in which the Superior Court of California has repeatedly held, on numerous occasions, that USC deprived the male student of a fair proceeding in adjudicating misconduct allegations.

191.  Upon information and belief, USC possesses additional documentation demonstrating its unlawful pattern of gender-biased adjudications and disparate treatment applied to males and females.

192.  The foregoing combination of internal institutional pressure, ongoing OCR investigations, and pressure from the United States Department of Education, under a threat of recession of federal funds, contributed to an overzealous prosecution and erroneous finding of responsibility against Mr. Boermeester.

193.  In fact, Education Secretary Betsy DeVos cited Mr. Boermeester's expulsion from USC as an example of a "failed system" for handling sexual assaults on college campuses during her speech of September 7, 2017 wherein she vowed to rewrite the rules put in place by the Obama administration's approach to Title IX enforcement.

194.  Based on the foregoing, Mr. Boermeester was subjected to a biased, prejudiced and inherently unfair process in violation of Title IX.

195.  This unlawful discrimination in violation of Title IX proximately caused Mr. Boermeester to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  consequential damages.

2  196.  As a result of the foregoing, Mr. Boermeester is entitled to damages in an

3  amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses,

4  costs and disbursements.

5  **AS AND FOR A SECOND CAUSE OF ACTION**

6  **Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, _et_**

7  **_seq._- Selective Enforcement**

8  **(Against University of Southern California)**

9  197.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully

10 set forth herein.

11 198.  As described above, the Title IX selective enforcement theory asserts that,

12 regardless of the student's guilt or innocence, the severity of the penalty and/or decision

13 to initiate the proceeding was affected by the student's gender.

14 199.  As detailed herein, USC violated Title IX's prohibition against selectively

15 enforcing its policies on the basis of gender.

16 200.  Specifically, USC intentionally discriminated against Mr. Boermeester because

17 he is a male when it initiated the proceeding against Mr. Boermeester despite the alleged

18 victim's denial of any wrongdoing, imposed an unwarranted interim suspension that was

19 in effect an expulsion, presumed him to be responsible for the alleged misconduct based

20 on archaic stereotypes about males and particularly male athletes, permitted a Title IX

21 Coordinator who had previously demonstrated a bias against males to act as investigator,

22 judge, jury and executioner, permitted the Title IX Coordinator to take an adversarial

23 role against a student USC was obligated to treat fairly, and imposed a "grossly

24 disproportionate" and an excessively harsh and punitive sanction of expulsion.

25 201.   Based on the foregoing, the actions taken and decisions made by USC in

26 carrying out the investigation and adjudication process were informed by Mr.

27 Boermeester's gender, without regard to guilt or innocence.

28 202.  Upon information and belief, the majority of Title IX cases at USC involve

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

female complainants and male respondents.

203.  Upon information and belief, Mr. Boermeester was found responsible and expelled because he is a male; given both parties were adamant that Mr. Boermeester never engaged in any conduct violative of USC's policies, there is no other logical explanation for the ultimate outcome.

204.  This unlawful discrimination in violation of Title IX proximately caused Mr. Boermeester to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

205.  As a result of the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- Denial of Fourteenth Amendment Procedural Due Process (Against All Defendants)

206.  Plaintiff repeats and re-alleges each and every allegation hereinabove as though fully set forth herein.

207.  The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

208.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation or custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress…

209.  As aptly observed by California's Second District Court of Appeals: "Due process - two preeminent words that are the lifeblood of our Constitution. Not a precise term, but most everyone knows when it is present and when it is not. It is often most conspicuous by its absence. Its primary characteristic is fairness. It is self-evident that a trial, an adjudication, or a hearing that may adversely affect a person's life must be conducted with fairness to all parties." *Doe v. Regents of Univ. of California* (2018) 28 Cal. App. 5th 44, 46.

210.  Given the severe implications of a responsibility finding in the university disciplinary context, an accused party must be afforded at least minimal procedural protections.

211.  Defendant USC, in its adjudication of sexual misconduct and violence and levying sanctions against students, is a state actor exercising its jurisdiction over offenses that traditionally have been part of the responsibilities of the States.

212.  The U.S. Supreme Court has ruled that a not-for-profit athletic association's regulatory activity was state action owing to the "close nexus between the state and the challenged action," the pervasive entwinement of state school officials in the association's structure, and the lack of a countervailing reason against attributing activity to the government. In so ruling, the U.S. Supreme Court reviewed the various circumstances in which an ostensibly private actor has been treated as a state actor, 531 U.S. at 296:

   i.    when the challenged activity results from the State's exercise of "coercive power" and provides "significant encouragement, either overt or covert," *Blum* v. *Yaretsky* (1982) 457 U. S. 991, 1004;

   ii.   when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar v. Edmondson Oil Co.* (1982) 457 U. S. 922, 941;

iii.   when a private actor is controlled by an agency of the state, *Pennsylvania v. Board of Directors of City Trusts of Philadelphia* (1957) 353 U.S. 230;

iv.   when the private entity has been delegated a public function by the State, *West v. Atkins* (1988) 487 U.S. 42, 56; and

v.   when the challenged activity is "entwined with governmental policies"; or when government is "entwined in [its] management or control," *Evans* v. *Newton* (1966) 382 U. S. 296, 299, 301.

213.   The key tests, then, are "Government coercion," "willful participation by the private actor," "Government control," "delegation of public function to private entity," and "entwinement with Government policy or Government management or control."

214.   In this case, with respect to Defendant USC's adjudication of alleged intimate partner violence, there has been a delegation of the public function of the state in adjudicating sexual misconduct on college campuses thus creating a "close nexus between the state and the challenged action" such that the ostensibly private behavior "may be fairly treated as that of the state itself." Here, USC's actions resulted from the government's exercise of "coercive power," where it provided "significant encouragement, either overt or covert," USC operated as a "willful participant in joint activity with the state or its agents" and has been controlled by an "agency of the state" and, with the delegation of a public function by the state, such that the ostensibly private entity is "entwined with governmental policies" or when government is "entwined in [the private entity's] management or control." *Brentwood*, 531 U.S. at 296.

215.   While private universities have been fighting the state action argument on the ground that the 2011 Dear Colleague Letter was merely guidance as opposed to binding law, Education Secretary Betsy DeVos in her September 7, 2017 speech unequivocally acknowledged the coercive nature of the Dear Colleague Letter, stating in part:

"Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.

. . . .

Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.

. . . .

Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment."

https://www.washingtonpost.com/news/grade-point/wp/2017/09/07/transcript-betsy-devoss-remarks-on-campus-sexual-assault/?utm_term=.9ae47dac7010

216.   Upon information and belief, during the Obama Administration, USC acted in response to the federal government's threat that colleges refusing to comply with the mandates of the Dear Colleague Letter would be found in violation of Title IX and be subject to substantial monetary penalties.

217.   Accordingly, USC was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the April 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives including the University's prior voluntary resolution with OCR concerning its handling of sexual misconduct matters on campus.

218.   Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

219.   When USC investigated and adjudicated the complaint made against Mr. Boermeester, and when it sanctioned him, USC was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

220.  In the course of USC's investigation and adjudication, it flagrantly violated Mr. Boermeester's clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness by, without limitation:

i. Failing to conduct an impartial investigation;

ii. Imposing an interim suspension prior to meeting or speaking with Mr. Boermeester which precluded him from attending classes during his final semester at USC, removed him from the football team, and prevented him from receiving rehabilitative care for his recent knee surgery performed by USC doctors;

iii. Adopting a trauma-informed investigative approach which caused the Investigators to disregard Ms. Katz's repeated denials of any wrongdoing on the part of Mr. Boermeester;

iv. Applying the preponderance of the evidence standard, rather than the clear and convincing evidence standard, despite the serious nature of the allegations and severe consequences that could result, including expulsion and a permanent marking on Mr. Boermeester's transcript and the concomitant lifelong damage to his reputation;

v. Failing to inform Mr. Boermeester of exculpatory evidence;

vi. Failing to provide Mr. Boermeester with meaningful access to evidence;

vii. Intimidating Mr. Boermeester (and Ms. Katz) by threatening additional charges and sanctions should either of them contact witnesses or take any action that the Title IX office could interpret as retaliation or interference with its investigation;

viii. Failing to provide any form of hearing, even though credibility determinations of the non-party witnesses were critical to the Investigators' findings;

---

ix.     Failing to provide any method through which Mr. Boermeester could ask questions of witnesses;

x.      Failing to provide an impartial adjudicator;

xi.     Failing to disclose the identities of the members of the sanctioning panel or the appellate panel thus depriving Mr. Boermeester of an opportunity to challenge the participation of any particular member based on conflicts of interest or bias;

xii.    Permitting Dr. Carry to arbitrarily and unilaterally increase the sanction recommended by the appellate panel, from a suspension to an expulsion; and

xiii.   Permanently damaging Mr. Boermeester's reputation by publicly announcing his removal from the school due to a conduct issue.

221. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

222. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

223. Prior to his expulsion, Mr. Boermeester was a student in good standing at USC. His constitutionally protected property interest in his continued enrollment at USC and to be free from arbitrary expulsion arises from the policies, courses of conduct, practices and understandings, established by USC.

224. Mr. Boermeester's constitutionally protected property interest further arises from the express and implied contractual relationship between USC and Mr. Boermeester.

225. A student who has been admitted to a university, and who has paid tuition- or on whose behalf tuition has been paid by means of an athletic scholarship-to that university, has a protected property interest in continuing his education at that university until he has completed his course of study.

226.  Consequently, when Mr. Boermeester faced disciplinary action that included the possibility of suspension or dismissal if found responsible, then USC was required to provide him with Due Process as established by the Fourteenth Amendment to the United States Constitution and established California law.

227.  USC, and the individual Defendants as agents of the University, have a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by USC.

228.  Defendants Dahlinger Means and Dr. Carry violated Mr. Boermeester's right to due process when they issued a finding of responsibility and imposed a penalty of expulsion on Mr. Boermeester, despite the fact that there was no reporting party or "victim", there was no opportunity for him to question the witnesses against him including the non-percipient third-party reporter, or the supposed complainant, no formal hearing before an impartial panel of decisionmakers, no opportunity to challenge the participation of any member of the secret appellate board, and no attempt to collect exculpatory evidence or give due consideration to the alleged "reporting party" who maintained that he did not engage in any conduct violative of USC's policies.

229.  The Investigators prosecuted Mr. Boermeester under a presumption of guilt, and conducted an investigation designed to fit their narrative of what they believed had occurred, despite clear evidence to the contrary.

230.  Mr. Boermeester had obeyed all institutional rules when he was wrongly interim suspended and ultimately expelled from USC.

231.  Under both federal and state law, Mr. Boermeester was entitled to due process including proper notice and a meaningful opportunity to be heard.

232.  Mr. Boermeester was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Mr. Boermeester.

233.  In the course of such investigation and adjudication, Defendants flagrantly

violated Mr. Boermeester's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness.

234. Defendants deprived Mr. Boermeester of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair investigation free of bias, his right to be heard by an impartial factfinder, and his right to cross examine witnesses and challenge witnesses.

235. Defendants, as well as other agents, representatives, and employees of Defendant USC, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Mr. Boermeester's constitutional rights. Defendant Dahlinger Means deprived Mr. Boermeester of his liberty and property interests without affording him basic due process without good faith and thus is not afforded qualified immunity for her actions. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

236. Based on the foregoing, USC was acting as a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the complaint against Mr. Boermeester.

237. As recently articulated by the Sixth Circuit in *Doe v. Baum*, a university disciplinary proceeding that may result in a sanction of expulsion or suspension must: (1) afford an accused student "some sort of hearing" and (2) "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum* (6th Cir. Sept. 7, 2018) 903 F.3d 575, 581.

238. Though the standard pronounced in *Baum* addressed the requirements in the context of a public university, there is no rational or logical basis for affording disparate constitutional protections to students who choose to attend a public university in comparison to students who choose to attend private universities, when the interests at

1  stake and potential ramifications are just as severe.[8]

2  239.  In fact, it is well established in California that procedural due process

3  protections are required in higher education disciplinary proceedings, regardless of

4  whether the institution is public or private.

5  240.  Two recent cases in the Court of Appeal of the State of California have

6  reaffirmed the rights to which a respondent in a Title IX university disciplinary

7  proceeding is entitled.

8  241.  In *Allee*, the Court of Appeal reversed the decision of the Superior Court,

9  holding the record revealed USC's disciplinary procedure failed to provide a fair hearing

10  because the accused student faced severe disciplinary sanctions, the disciplinary decision

11  turned on witness credibility, and USC's procedure failed to provide a mechanism for

12  effective cross-examination of the accuser and adverse witnesses. *Doe v. Allee*, supra, 30

13  Cal.App.5th 1036, at *20.

14  242.  The Court found, "when a student accused of sexual misconduct faces severe

15  disciplinary sanctions, and the credibility of witnesses (whether the accusing student,

16  other witnesses, or both) is central to the adjudication of the allegation, fundamental

17  fairness requires, at a minimum, that the university provide a mechanism by which the

18  accused may cross-examine those witnesses, directly or indirectly, at a hearing in which

19  the witnesses appear in person or by other means (such as means provided by technology

20  like videoconferencing) before a neutral adjudicator with the power independently to

21  find facts and make credibility assessments." As USC's process failed to provide these

22  protections, the Court declared that the disciplinary decision could not stand.

23  243.  Similarly, in *Doe v. Ainsley Carry, et al.* (Case No. B282164, January 8, 2019),

24  the Court of Appeal reversed and remanded a judgment issued by the Superior Court of

---

25  [8] Given the variety of considerations that go into a student's college search, including

26  the availability of financial aid or scholarships, location, and programs offered, students

27  should not further be burdened with the decision of whether to attend a public or private

28  college based upon the constitutional protections that would be afforded to them in the

event they were accused of a violation of the school's policies.

Los Angeles, finding that for the same reasons articulate in *Allee,* USC failed to provide the plaintiff with a fair disciplinary hearing, and the finding was thus set aside. *Doe v. Carry,* No. B282164, 2019 WL 155998, at *1 (Cal. Ct. App. Jan. 8, 2019)

244. Further articulating the lack of fairness inherent in USC's disciplinary system, the Court stated:

> "As we have explained, in USC's system, no in-person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral factfinder can observe and assess the witness' credibility. (*citing Baum, supra,* 903 F.3d at p. 586 ("Few procedures safeguard accuracy better than adversarial questioning though cross-examination…")…
>
> (*Doe v. Carry,* 2019 WL 155998, at *9.)

245. Analogous to these two recent matters, as the finding against Mr. Boermeester turned on the credibility of 14 witnesses, none of whom had personal knowledge of the alleged misconduct, a fair process required that he be permitted to challenge all witnesses at a live hearing before a panel of impartial decision makers.

246. Instead, USC's policies deprived him of the fair process and procedural protections to which he was entitled.

247. Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

248. As a direct and proximate result of the above conduct, Mr. Boermeester has

sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

249. Mr. Boermeester further seeks punitive damages against Defendants Dahlinger Means and Dr. Carry in their individual capacities for violations of Mr. Boermeester's well-established fundamental rights.

250. As a result of the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

251. As a result of the foregoing, Mr. Boermeester is also entitled to prospective injunctive relief: (i) reversing the outcome and findings regarding the charges filed against him; (ii) expunging his disciplinary record; (iii) removing any record of his expulsion from his education file and/or transcript; and (iv) permanently destroying any record of the third-party complaint.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against University of Southern California)

252. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

253. It is well established that the basic relationship between a student and a university is contractual in nature. *Kashmiri v. Regents of Univ. of California,* 156 Cal. App. 4th 809 (2007), *as modified* (Nov. 15, 2007), *as modified* (Nov. 28, 2007). "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created...." *Id. (internal citations omitted).*

254. At all times relevant hereto, a contractual relationship existed between USC and Mr. Boermeester through USC's policies and procedures governing the student disciplinary system, including but not limited to the SCampus Handbook 2016-2017 and the Policy and Procedures on Student Sexual, Interpersonal, and Protected Class

Misconduct.

255.  Through the documents it publishes and provides to its students, USC makes express contractual commitments to students involved in its disciplinary process.

256.  Mr. Boermeester applied to, and chose to enroll and accept an athletic scholarship at, USC for which all associated tuition, fees and expenses were paid in exchange for a commitment to his academics and athletic obligations. He did so in reliance on his understanding, and with the reasonable expectation that USC would adhere to its stated policies, including its policies related to the adjudication of misconduct matters, and would implement and enforce its policies as set forth in its official publications.

257.  Based on the foregoing, USC created express and implied contracts with Mr. Boermeester.

258.  USC, through Investigator Helsper, further made express representations to Mr. Boermeester concerning his "rights" in the investigative process.

259.  In addition to violating the terms of its own Policies, USC violated the covenant of good faith and fair dealing implied in every contract, which implicitly guaranteed that any proceedings would be conducted with basic fairness.

260.  Based on the aforementioned facts and circumstances, USC breached express and/or implied agreement(s) with Mr. Boermeester.

261.  USC committed multiple breaches of its agreements with Mr. Boermeester during the investigation and adjudication process, including, without limitation:

  i.  Defendants imposed an interim suspension on Mr. Boermeester despite a lack of reliable evidence, and despite the alleged victim refuting that he posed a "substantial threat to the safety or well-being of members of the university community, to property within the university community or…a continuing threat of disruption or interference to normal university life or functions."

  ii.  Defendants failed to conduct a fair and impartial review of the incident when they presumed Mr. Boermeester guilty from the outset and presumed Ms.

Katz to be a "battered" woman whose denials of wrongdoing were the result of her having endured a substantial trauma.

iii. Defendants failed to afford Mr. Boermeester equal treatment as a member of the USC student body, and instead approached this investigation more aggressively given his "high profile" status as a member of the football team. For instance, Helsper referred to Mr. Boermeester as an "all-star football player" during their first meeting on January 30, 2017, Dahlinger Means referenced Baylor University's prior mishandling of sexual assault allegations against members of its football team, assuring Ms. Katz that "[USC knows] how to handle football players", USC publicly announced his removal from USC due to a conduct issue which permanently and irreparably damaged his reputation, and the expulsion letter mentioned Mr. Boermeester's "high profile" status as a factor justifying the expulsion.

iv. Dahlinger Means initiated an investigation against Mr. Boermeester on her own accord despite the lack of any concern by the alleged victim related to either the "well-being of the campus or the personal safety or well-being of any member of the university community."

v. Defendants deprived Mr. Boermeester of his right to have an advisor of his choice when Dahlinger Means unilaterally concluded that Howard Croom, the individual whom Mr. Boermeester had selected to serve as his advisor was a witness and thus unable to serve in the advisor role, even though the only relevant information Mr. Croom had knowledge of was that Mr. Boermeester had learned on January 26 that he was the subject of a Title IX matter.

vi. Despite Ms. Katz's repeated insistence that Mr. Boermeester had never engaged in any conduct violative of USC's policies, and notwithstanding her clear statement that she did *not* want to pursue a formal investigation against him, the Title IX office assumed an adversarial role when it proceeded with the investigation against Mr. Boermeester.

vii. Defendants failed to utilize the preponderance of the evidence standard when they deemed third-party/hearsay witnesses to be more credible than the statements of Mr. Boermeester and Ms. Katz themselves.

viii.    Defendants found Mr. Boermeester responsible for a violation of USC's policy on intimate partner violence and causing physical harm to Ms. Katz despite the absence of any evidence showing he caused her such harm.

ix.    Defendants failed to exclude information that was not relevant, credible or reliable such as the statements of third parties that had no independent knowledge of the alleged conduct at issue, including the information provided by Coach Peter Smith who simply had no personal knowledge on which to base any of his conclusory and demonstrably false statements concerning Mr. Boermeester and Ms. Katz's relationship or their interaction on the evening of January 20, 2017. As articulated by Ms. Katz in her appeal, "Title IX appears to have taken every rumor, every piece of gossip, every improper assumption that portrays [Mr. Boermeester] negatively, and treated it as fact."

x.    Defendants failed to limit the evidence considered to that which was "relevant, material and temporally proximate to the conduct at issue;" instead including baseless third-party opinions about the nature of Mr. Boermeester and Ms. Katz's relationship, hearsay from Mr. Smith concerning Mr. Boermeester's relationship with an ex-girlfriend who was not even a student at USC, and unrelated text messages that were cherry picked and taken out of context.

xi.    Defendants disregarded witnesses identified by Mr. Boermeester in violation of his right to offer all relevant information and evidence.

xii.    Defendants included in the Summary Administrative Review inculpatory evidence purportedly provided by Witness L.M., even though the Investigators *never* actually spoke with L.M.

xiii.    Defendants contacted Mr. Boermeester's ex-girlfriend from high school for the sole purpose of impugning his reputation and character in direct violation of the Policies.

xiv.    Defendants failed to provide the "specific acts, the date/period of time, and location" of Mr. Boermeester's alleged violation of the Avoidance of Contact Order in the February 14, 2017 notice of second charge.

xv.    USC failed to conduct a prompt and timely investigation and failed to identify any "good cause" warranting the excessive delay- instead, in what cannot possibly be attributed to mere coincidence, USC delayed issuance of its findings for more than one month, ultimately providing the expulsion decision to Mr. Boermeester on May 2, 2017, the week before his anticipated graduation date.

xvi.    Defendants failed to utilize trained and experienced investigators as evidenced by Helsper's unfamiliarity with the process and policies during her meeting with Mr. Boermeester on January 30, 2017 as well as her meetings with Ms. Katz.

262.  Based on the aforementioned facts and circumstances, USC breached its express agreement with Mr. Boermeester.

263.  Based on the aforementioned facts and circumstances, USC breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Mr. Boermeester.

264.  As a direct and foreseeable consequence of the foregoing breaches, Mr. Boermeester sustained damages, including, without limitation, reputational damage, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

265.  As a result of the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**<u>Promissory Estoppel</u>**

**<u>(Against University of Southern California)</u>**

266.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

267.  USC's various policies constitute representations and promises that USC should have reasonably expected to induce action or forbearance by Mr. Boermeester.

268.  USC expected or should have reasonably expected Mr. Boermeester to accept its offer of admission, incur expenses, and choose not to attend other colleges based on its express and implied promises that USC would not discriminate against Mr. Boermeester and would not deny him his procedural rights should he be investigated for an alleged violation of the University's policies.

269.  Mr. Boermeester relied to his detriment on these express and implied promises and representations made by USC.

270.  Based on the foregoing, USC is liable to Mr. Boermeester based on estoppel.

271.  As a direct, reasonable and foreseeable consequence of these breaches, Mr. Boermeester sustained damages, including without limitation, economic injuries, the inability to complete his studies at USC or transfer to another college of equal caliber, and other direct and consequential damages.

272.  As a result of the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Negligence

### (Against All Defendants)

273.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

274.  In order to state a negligence claim under California law, a plaintiff must show that the defendant owed the plaintiff a duty, defendant breached that duty, and such breach was the proximate cause of plaintiff's damages.

275.  California courts have recognized the "special relationship" that exists between a university and its students, which gives rise to a duty of care "while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." *Univ. of S. California v. Superior Court of Cty. of Los Angeles,*

No. B288180, 2018 WL 6649594, at *8 (Cal. Ct. App. Nov. 27, 2018)

276.  Here, Defendants formed a university-student relationship with Mr. Boermeester and owed him a duty to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict, and to ensure proper training to those responsible for investigating and adjudicating the alleged policy violations.

277.  Such duties arise from USC's relationship with Mr. Boermeester, as a student of the University, an obligation acknowledged by USC's policies.

278.  The foregoing duties were breached when Mr. Boermeester did not receive the full protections of the disciplinary process, and when he was subjected to a biased and defective procedure.

279.  The foregoing duties were further breached when USC failed to address or remedy the innate, and publicly acknowledged, biases of Dahlinger Means, who continues to abuse her power through fear and intimidation tactics. Permitting its supposedly neutral Title IX Coordinator to remain in place after admittedly referring to a USC student as a "motherfucker" demonstrates either willful blindness or deliberate indifference on the part of USC, either of which resulted in a breach of its duty of care owed to all students, including Mr. Boermeester.

280.  Mr. Boermeester suffered injuries as a direct result of Defendants' breach of the duties owed to him as a student of USC, including loss of educational and career opportunities, economic losses, emotional and reputational damages.

281.  As a result of the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

282.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

283.  During the investigation and adjudication process, Defendants exhibited

extreme and outrageous conduct including but not limited to the following:

i.    Defendants imposed an interim suspension, prior to meeting or speaking with Mr. Boermeester, which precluded him from attending classes during his final semester at USC, removed him from the football team, and prevented him from receiving rehabilitative care for his recent knee surgery performed by USC doctors.

ii.   Defendants publicly escorted Mr. Boermeester off campus, prohibiting him from even clearing out his locker or obtaining his memorabilia from the Rose Bowl, prior to any investigation being performed and despite the absence of any disciplinary history.

iii.  One day after Mr. Boermeester received the notice of interim suspension, USC charged him personally for the two classes that he was enrolled in as a requirement for graduation. As a result of the interim suspension, Mr. Boermeester was removed from these classes, received grades of "F" in each class (as opposed to withdrawn notations), and his transcripts were locked per a financial hold, precluding him from applying to other institutions. [9]

iv.   Defendants treated Mr. Boermeester as an adversary and prosecuted him under a presumption of guilt, based on innate biases against male athletes, and football players in particular.

v.    Defendants pursued an investigation against Mr. Boermeester despite the alleged "victim's" repeated declarations that he had not engaged in any prohibited conduct, and against her wishes that no investigation take place.

vi.   Defendants utilized intimidation tactics and the threat of additional institutional action to prevent Mr. Boermeester from speaking with Ms. Katz who was the only other person present for the duration of the interaction at

---

[9] This issue was ultimately resolved more than one year later, in February 2018. However, the delay in removing the registration hold prevented Mr. Boermeester from seeking admission to summer 2017 or fall 2017 programs through which he could have earned the outstanding credits towards his degree.

issue, as well as other potential witnesses, thus depriving Mr. Boermeester of a full and fair opportunity to defend himself.

vii.   On or about February 7, 2017, Defendants publicly leaked to the media that Mr. Boermeester had been removed from the USC football team and had been indefinitely suspended.

viii.   Defendants issued to Mr. Boermeester a vague and procedurally inadequate second charge, for allegedly violating the AOC Order, on Valentine's Day 2017 while Mr. Boermeester and Ms. Katz were together celebrating the holiday.

ix.   Defendants' investigation far exceeded the scope of the alleged violations when they sought to elicit information wholly irrelevant to the conduct at issue for the sole purpose of embarrassment and to impugn Mr. Boermeester's character and reputation.

x.   Defendants withheld issuance of the decision to expel Mr. Boermeester until the week prior to his expected graduation date, and until such time as it was too late for him to enroll in summer courses to finish his degree.

xi.   Mr. Boermeester was provided only 10 days to appeal the expulsion decision, with the appeal due on his anticipated graduation date.

xii.   Defendants permanently and irreparably damaged Mr. Boermeester's reputation by publicly announcing his removal from the school due to a conduct issue during the summer of 2017.

xiii.   Defendants' failed to conduct a prompt and timely investigation, and the nature of the questions asked and their leading manner contributed to ongoing rumors, gossip, and ridicule directed at Mr. Boermeester.

284.   Defendants were undoubtedly aware of Mr. Boermeester's "high profile" status at USC and that such public declarations of his guilt would result in irreparable lifelong damages to his name, reputation, academics and career.

285.   Such extreme and outrageous conduct was either intentional or in reckless

disregard that such conduct would in fact cause emotional distress to Mr. Boermeester.

286.  As a direct result of the foregoing, Mr. Boermeester has in fact suffered severe emotional distress including anxiety, stress, depression, hopelessness, headaches, insomnia, weight loss, loss of appetite, humiliation, reputational damages, and mental anguish.

287.  Defendants' actions in investigating and adjudicating the false allegations against Mr. Boermeester were the actual and proximate cause of such distress.

288.  Based on the foregoing, Mr. Boermeester is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## JURY DEMAND

Plaintiff Matthew Boermeester herein demands a trial by jury of all triable issues in the present matter.

Respectfully submitted,

Date:  March 21, 2019

By:  _____/S/_____.
NESENOFF & MILTENBERG LLP
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com

HATHAWAY PARKER
Mark Hathaway, Esq.
445 S. Figueroa Street, 31st Floor
Los Angeles, California 90071
(213) 529-9000
mark@hathawayparker.com

*Attorneys for Matthew Boermeester*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
55

Exhibit A

Samantha Greene
Kerry L. Steigerwalt

Vanessa Albert
Alexander H. Fuqua

Law Office
# Sevens Legal, APC

3555 Fourth Avenue
San Diego, CA 92103
www.sevenslegal.com
(619) 297-2800

FOR IMMEDIATE RELEASE
July 30, 2017

### Zoe Katz Statement about the USC Title IX Investigation of Matt Boermeester

*Los Angeles, CA* - I really do not know how to make a statement like this but I am determined to try to have my voice heard.

I am Zoe Katz and I am a 22 year old student athlete at USC (captain of the women's tennis team), nationally ranked singles player and have been dating Matt Boermeester for well over a year. Matt, the Trojan kicker who helped win the Rose Bowl, has been falsely accused of conduct involving me.

The fact that I have to publicly state this truth is because of how both Matt and I have been treated by USC's Title IX office.

I am speaking up now because this horrible and unjust six-month process has finally concluded. I will tell you that I am afraid of USC's Title IX office. I hope that my comments will not cause USC's Title IX office to further retaliate against me in any way.

I want to be very clear that I have never been abused, assaulted or otherwise mistreated by Matt. He is an incredible person, and I am and have been 100% behind him. Nothing happened that warranted an investigation, much less the unfair, biased and drawn out process that we have been forced to endure quietly.

Terrible and untrue things have been said about Matt by people who don't even know him, including apparently the third party who contacted Title IX, and these bizarre assertions have been treated as fact in this investigation. Words, including mine, have been incompetently or intentionally misrepresented, misquoted and taken out of context, which should not be that surprising since no statements were recorded or verified.

The first time I was mandated to come in and be interviewed by the Title IX office, I was told that I must be afraid of Matt, which I definitely was not and am not. When I told the truth about Matt, in repeated interrogations, I was stereotyped and was told I must be a "battered" woman, and that made me feel demeaned and absurdly profiled. I understand that domestic violence is a terrible problem, but in no way does that apply to Matt and me.

On one occasion I was told to come in to view a videotape - which I was happy to do - and then nothing was shown to me. It ended up being just another interrogation. I feel I was misled, harassed, threatened and discriminated against by the Title IX office to such an extent that I had to retain my own attorney during the process to protect myself and to try to get them to listen to me. The Title IX office's response was dismissive and demeaning, "We are sorry you feel that way."

Looking back, Matt never had a chance. Before he was even interviewed by the Title IX investigator, he was suspended from the University. He was not permitted to go to class or be on campus (he had two classes left

Zoe Katz Decl. Attachment, Page 1

**000415**

Exhibit A, page 1



to graduate and he was not allowed to take them elsewhere), he was not permitted to rehabilitate his knee with our trainers (he had surgery by USC doctors two weeks before), he was publicly removed from the football team and all of its activities, he was forbidden to contact me because of an unfounded concern about my safety (it was a one-way no contact order, and every one of my repeated attempts and those of my own attorney to have it lifted it were denied), and he was told he could not talk about the matter or he would potentially face another alleged violation of the policy.

Others in the University community were told they could not talk to Matt or they could be investigated too. He was completely cut off from his school and the team he had kicked to victory in the Rose Bowl. I was told that if I contacted Matt, "things would not go well for him." I was also told that I could be charged and investigated if I spoke to anyone who they decided to call in as possible "witnesses."

Matt and I love USC. We have given our best on the tennis court and on the football field. I do not understand how this situation could have been allowed to happen, especially at USC.

The USC I know and really love upholds values like family, trust and excellence. Facts and fairness are supposed to govern Title IX and not agendas, intimidation and falsehoods. I am so sad that a rogue group like the Title IX office can bring down this amazing school. On behalf of all Trojans, I have to speak up. But more importantly, I am speaking up for myself and for Matt. I will not permit anyone to portray me as a victim, I am not. Nor will I stand by silently and watch a good person like Matt be railroaded by a rigged system.

Matt Boermeester did nothing improper against me, ever. I would not stand for it. Nor will I stand for watching him be maligned and lied about, and I implore the USC community to stand together to stop this from happening to Matt or anyone else.

I know we are not alone.


https://scepticsociety.com/2017/07/23/a-new-class-of-victims-abuse-of-title-ix-at-the-university-of-southern-california/

http://reason.com/blog/2016/08/02/usc-title-ix-official-campus-rape

http://helpsaveoursons.com/uscs-eight-title-ix-lawsuits-in-superior-court-filed-by-males/


If you want any further information, please contact my attorney Kerry Steigerwalt.

Zoe Katz Decl. Attachment, Page 2
Exhibit A, page 2

000416