NESENOFF & MILTENBERG, LLP
ANDREW T. MILTENBERG, Esq. (admitted *pro hac vice*)
amiltenberg@nmllplaw.com
STUART BERNSTEIN, Esq. (admitted *pro hack vice*)
sbernstein@nmllplaw.com
TARA J. DAVIS, Esq. (admitted *pro hac vice*)
tdavis@nmllplaw.com
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone:  (212) 736-4500

HATHAWAY PARKER
MARK HATHAWAY, Esq.
mark@hathawayparker.com
JENNA E. PARKER, Esq.
jenna@hathawayparker.com
445 S. Figueroa Street, 31st Floor
Los Angeles, California 90071
Telephone: (213) 529-9000

*Attorneys for Matthew Boermeester*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MATTHEW BOERMEESTER,<br><br>      Plaintiff,<br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, GRETCHEN DAHLINGER MEANS, individually and in her official capacity, and Dr. AINSLEY CARRY, individually and in his official capacity,<br><br>      Defendants. | Case No.: 2:19-cv-02137-R-MRW<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO FRCP 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE THE FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF PURSUANT TO CCP § 425.16**<br><br>DATE:  June 17, 2019<br>TIME:   10:00 a.m.<br>JUDGE:  Hon. Manuel L. Real<br>CTRM:  880 |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................6

I.    STATEMENT OF FACTS. ..............................................................................6

II.   PLAINTIFF HAS EXHAUSTED JUDICIAL REMEDIES. ...............................6

      A.    Plaintiff Exhausted Judicial Remedies by Filing 1094.5 Petition..........6

      B.    Relief Sought Through Plaintiff's Federal Action Is Distinct from
            Relief Sought Pursuant To 1094.5 Petition.......................................9

      C.    Alternatively, This Matter Should Be Stayed Pending Court of Appeal
            Decision, As Applicable Statute of Limitations Necessitated
            Commencement of This Action. ...................................................10

III.  PLAINTIFF PLAUSIBLY ALLEGES ERRONEOUS OUTCOME AND
      SELECTIVE ENFORCEMENT UNDER TITLE IX. .......................................10

      A.    Standard of Review. ...................................................................10

      B.    The *McDonnell Douglas* Burden-Shifting Framework Applies.................10

      C.    Erroneous Outcome.....................................................................12

            1.    Facts Cast Articulable Doubt on Accuracy of the
                  Outcome. .........................................................................13

            2.    Gender Bias Was A Motivating Factor.............................15

                  a.    Evidence of External Pressure on USC, and
                        Dahlinger Means, to Address Sexual Assault
                        Allegations is Sufficient to Create Plausible
                        Inference of Gender Bias. .......................................16

                  b.    Dahlinger Means Demonstrated Bias Against
                        Plaintiff as a Result of His Status as a Male
                        Athlete...................................................................18

                  c.    Dahlinger Means Demonstrated Bias Against
                        Plaintiff by Treating Ms. Katz as a Victim Despite
                        Ms. Katz's Repeated Denials of Wrongdoing.........19

      D.    Selective Enforcement..................................................................20

---

1

IV.   DEFENDANTS WERE ENGAGED IN STATE ACTION. ..............................21

V.    MOTION TO STRIKE OR DISMISS FOURTH, FIFTH, SIXTH, AND
      SEVENTH CAUSES OF ACTION FOR DAMAGES MUST BE DENIED. ...23

      A.    Defendants Fail to Make a Prima Facie Showing That Plaintiff's
            Claims Arise from Protected Activity. ........................................................24

      B.    Claims for Relief Do Not Arise from Act in Furtherance of a Person's
            Right of Petition or Free Speech. ........................................................26

            1.    Plaintiff's Fourth Cause of Action for Breach of Contract
                  Does Not Arise from Protected Activity. ...........................................26

            2.    Plaintiff's Fifth Cause of Action for Promissory Estoppel
                  Does Not Arise from Protected Activity. ...........................................27

            3.    Plaintiff's Sixth Cause of Action for Negligence Does
                  Not Arise from Protected Activity. .....................................................28

            4.    Plaintiff's Seventh Cause of Action for IIED Does Not
                  Arise from Protected Activity. ...........................................................29

      C.    Plaintiff Has Alleged Entitlement to Relief. ...............................................29

      D.    USC Offers Zero Basis For Dismissal. ........................................................30

VI.   CONCLUSION. .................................................................................................30

1

# TABLE OF AUTHORITIES

2

## Federal Cases

3
*Ashcroft v. Iqbal* (2009) 556 U.S. 662 ................................................................. 10

4
*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544 ....................................... 10

5
*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575 ...................................................... 13, 16

6
*Doe v. Columbia Univ.* (2d Cir. 2016) 831 F.3d 46 ....................................... 11, 15, 16, 20

7
*Doe v. Marymount Univ.* (E.D. Va. Mar. 14, 2018) 297 F.Supp.3d 573 ............... 13, 15

8
*Doe v. Miami Univ.* (6th Cir. 2017) 882 F.3d 579 ......................................... 15, 16

9
*Doe v. Regents of the Univ. of California* (C.D. Cal. Dec. 14, 2015) No.
10
215CV02478SVWJEM, 2015 WL 13755510 ....................................................... 21

11
*Doe v. Regents of the University of California* (9th Cir. 2018) 891 F.3d 1147 ........... 7, 8

12
*Doe v. Regents of the University of California* (C.D. Cal. June 8, 2017) 2017
13
WL 4618591 ................................................................................................. 11

14
*Doe v. Washington & Lee U.* (W.D. Va. Aug. 5, 2015) 2015 WL 4647996 ................ 16

15
*Heineke v. Santa Clara Univ.* (N.D. Cal. Dec. 5, 2017) No. 17-CV-05285-
16
LHK, 2017 WL 6026248 ................................................................................ 22

17
*Lyons v. England* (9th Cir. 2002) 307 F.3d 1092 ............................................... 11

18
*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 ................................. 11

19
*Neal v. Colo. State University-Pueblo* (D. Colo. Feb. 16, 2017) No. 16-cv-
20
873, 2017 WL 633045 ..................................................................................... 16

21
*Pareto v. F.D.I.C.* (9th Cir.1998) 139 F.3d 696 ............................................... 10

22
*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133 ................... 12

23
*Reynaga v. Roseburg Forest Prod.* (9th Cir. 2017) 847 F.3d 678 ................... 12

24
*Sprewell v. Golden State Warriors* (9th Cir.2001) 266 F.3d 979 ..................... 10

25
*Westlake Cmty. Hosp. v. Superior Court* (1976) 17 Cal.3d 465 ....................... 8

26
*Yusuf v. Vassar Coll.* (2d Cir. 1994) 35 F.3d 709 ......................................... 13, 15, 21

27

## State Cases

28
*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915 ............... 27

*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244 ..........................28

*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533............................................11, 12

*Doe v. Ainsley Carry, et al.* (Cal. Ct. App. Jan. 8, 2019) No. B282164, 2019
   WL 155998..........................................................................................................23

*Doe v. Allee* (2019) 30 Cal.App.5th 1036........................................................22

*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212.........................23

*Gupta v. Stanford Univ.* (2004) 124 Cal.App.4th 407 .......................................7

*Hughes v. Pair* (2009) 46 Cal.4th 1035 .........................................29

*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61 ........................................7

*Kibler v. N. Inyo Cty. Local Hosp. Dist.* (2006) 39 Cal.4th 192 ....................................24

*Laker v. Bd. of Trustees of California State Univ.* (Ct. App. 2019) 244
   Cal.Rptr.3d 238 ................................................................................................passim

*Park v. Bd. of Trustees of California State Univ.* (2017) 2 Cal.5th 1057.................26, 28

*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887 ............................28

**Statutes**

42 U.S.C. §1983...............................................................................22

Cal. Educ. Code § 67386 ..................................................................27

Code Civ. Proc. § 1094.5 ...........................................................7, 9

Code Civ. Proc. § 425.16 ........................................................25, 26, 30

**Rules**

Fed. Rule of Civ. Proc. 12(b)(6) .................................................10, 30

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES
## I.   STATEMENT OF FACTS.[1]

3
4
5
6
7
8
9
10
11
12
13

As of January 21, 2017, Plaintiff Matthew Boermeester was a 22-year-old senior full-scholarship athlete at the University of Southern California ("USC" or "University"). (Complaint, ¶ 27).  Mr. Boermeester had been dating Zoe Katz ("Ms. Katz")[2], also 22 years old and a Senior at USC, for over a year. (Complaint, ¶ 31).  Upon returning to Ms. Katz's off-campus residence, the two engaged in horseplay and Mr. Boermeester playfully put a hand on her neck, in a joking, intimate manner, and then entered Ms. Katz's building together. (Complaint, ¶ 34).  Student Dylan Holt, who had seen part of their interaction through his window, told his roommate Tanner Smith what he thought he had observed—an alleged altercation. (Complaint, ¶¶ 8, 42). Tanner Smith later spoke to his father Peter Smith, Coach of the USC Men's Tennis team, about what Dylan Holt had told him (Complaint, ¶ 44) and a report was made to USC's Title IX office.

14
15
16
17
18
19
20
21
22

Almost immediately Mr. Boermeester was banned from campus, classes, and all USC activities, including the USC football team, despite both he and Ms. Katz denying that any "intimate partner violence" had occurred. (Complaint, ¶¶ 56, 62, 81.) The week prior to Mr. Boermeester's anticipated graduation date, on May 2, 2017, the Misconduct Sanctioning Panel met and accepted the investigator's findings and concluded an expulsion was warranted. (Complaint, ¶ 111). Both Mr. Boermeester and Ms. Katz submitted appeals, challenging the findings and seeking to overturn the sanction. (Complaint, ¶ 116). However, on July 7, 2017, Defendant Dr. Ainsley Carry approved the findings of the Title IX investigator. (Complaint, ¶ 118).

23
24

## II.   PLAINTIFF HAS EXHAUSTED JUDICIAL REMEDIES.
### A. Plaintiff Exhausted Judicial Remedies by Filing 1094.5 Petition.

25
26

The doctrine of exhaustion of judicial remedies precludes an action challenging the result of a quasi-judicial proceeding unless a plaintiff first challenges the decision

27
28

---

[1] Complete facts are in Appellant's Opening Brief, pp. 17-34.  (*See* PL RJN, <u>Exh.</u> 4.)
[2] There is no basis to identify Ms. Katz by fictitious name pursuant to FERPA.

through petition for writ of mandamus. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70.) Mandamus is available to review "any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer…" (Code Civ. Proc. § 1094.5, subd. (a)).

Defendants' reliance on *Doe v. Regents of the University of California* (9th Cir. 2018) 891 F.3d 1147 and *Gupta v. Stanford Univ.* (2004) 124 Cal.App.4th 407 in support of their proposition that Plaintiff failed to exhaust judicial remedies is misplaced. The plaintiffs in those matters never sought review of the quasi-judicial proceedings through a mandamus petition. Contrarily, on August 11, 2017, Plaintiff timely filed a Petition for Writ of Mandamus (the "Petition") in the Superior Court of the State of California for the County of Los Angeles, Central District (Case No. BS170473) pursuant to Code Civ. Proc. § 1094.5, against USC and Dr. Ainsley Carry. (Complaint, ¶ 124; DF RJN, Exh. 1). In his Petition, Plaintiff sought to reverse his expulsion on the grounds that USC failed to grant him a fair hearing, failed to proceed in the manner required by law, and committed a prejudicial abuse of discretion in that the decision was not supported by the evidence. (Complaint, ¶ 125). Plaintiff's Petition was denied on March 21, 2018 by the Honorable Judge Amy D. Hogue. (Complaint, ¶ 126). Subsequently, on June 14, 2018, Plaintiff voluntarily sought appellate review when he filed a notice of appeal with the Court of Appeal of the State of California, Second Appellate District. On April 19, 2019, Plaintiff filed his Appellant's Opening Brief. (PL RJN, Exh. 4). The status of Plaintiff's appeal does not negate his prior compliance with the judicial exhaustion requirement. Nonetheless, while Defendants spend considerable time discussing the effect of the Superior Court's denial of the Petition, given decisions recently issued by the Court of Appeal in January 2019, discussed further below, there is no question that USC failed to provide proper procedures when it did not afford Plaintiff an opportunity for a live hearing or cross-examination, and denial of the Petition should be reversed on appeal. Accordingly, this matter should be stayed.

As expressly held by the Ninth Circuit in *Doe v. Regents*, a student's suspension from university is the sort of "adjudicatory, quasi-judicial decision" subject to the judicial exhaustion requirement; thus, in California, "[a] party must exhaust judicial remedies by **filing** a § 1094.5 petition, the exclusive and 'established process for judicial review' of an agency decision." (*Doe v. Regents*, 891 F.3d at 1155 (emphasis added).) Nowhere in *Doe v. Regents* or *Gupta v. Stanford* does the court impose a requirement that not only must the party challenging disciplinary dismissal petition for writ of mandamus and also be successful on the petition before he is permitted to bring a lawsuit for damages. The only case cited by Defendants in support of a purported "success" prerequisite is *Westlake Community Hospital v. Superior Court*, a 1976 case in which the plaintiff physician challenged a hospital's revocation of staff privileges. Recognizing the contractual relationship between the parties, the Court narrowly held, "whenever a hospital, pursuant to a quasi-judicial proceeding, reaches a decision to deny staff privileges, an aggrieved doctor must first succeed in setting aside the quasi-judicial decision in a mandamus action before he may institute a tort action for damages." (*Westlake Cmty. Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 469.) The requirement that one succeed in mandamus prior to initiating a tort action for damages appears to be limited to the very specific scenario in which a physician challenges the denial of hospital privileges.

In arguing for the extension of *Westlake* to the present matter, Defendants misconstrue the purpose and intent of the Court's holding. The referenced line of case law is generally premised on the fact that the entity which performed the quasi-judicial proceeding at issue is a public or governmental organization. As public entities, they are entitled to certain presumptions about the fairness and inherent reliability of their disciplinary procedures. The medical industry is governed by comprehensive statutory and regulatory schemes, which afford a great deal of transparency in disciplinary matters. This level of transparency simply does not exist in the student conduct context at private and public universities. Thus, when the entity performing the investigation is a private corporation, as in the instant matter, presumptions of fairness and reliability do not apply.

(*See Westlake*, 17 Cal.3d at 484 ("quasi-judicial decision reached by a tribunal of a private association may not be entitled to exactly the same measure of respect as a similar decision of a duly constituted public agency").) This distinction is significant in determining the scope of the mandamus requirement in the student disciplinary context.

Plaintiff brings tort, civil rights, and contractual claims related to his erroneous discipline from a university, through which he seeks damages and injunctive relief. The specific circumstances warranting imposition of a requirement that plaintiff brings, and succeeds on, a writ petition in superior court before pursuing a tort action, are simply not analogous to the student conduct context at a private university. As the holding in *Westlake* does not extend to the facts of the instant matter, Plaintiff was not required to succeed on his petition before commencing this action. Therefore, he properly exhausted judicial remedies by timely filing his Petition in Superior Court.

### B. Relief Sought Through Plaintiff's Federal Action Is Distinct from Relief Sought Pursuant To 1094.5 Petition.

In his Petition, Plaintiff sought reversal of his expulsion. Here, Plaintiff seeks not only a reversal of his expulsion, but also damages in an amount to be determined at trial, punitive damages against Defendants Dahlinger Means and Dr. Carry in their individual capacities, and prospective injunctive relief expunging his disciplinary record, removing any record of the expulsion from his education file and permanently destroying any record of the complaint, none of which are available remedies under 1094.5.

Moreover, the inquiry in mandamus is limited to: "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc. § 1094.5.) In the present matter, Plaintiff challenges not only the ultimate decision reached, but also the gender biased nature of the proceedings, the University's violations of its educational contract with Plaintiff, Defendants' failure to act with due care in carrying out the investigative process, Defendants' failure to ensure confidentiality when issuing national press releases concerning Plaintiff's circumstances and fate, and the intentional infliction

on Plaintiff of severe emotional distress given the circumstances. The foregoing challenges to Defendants' actions are properly considered before this Court in this federal action, and are not pending before the Appellate District

### C. Alternatively, This Matter Should Be Stayed Pending Court of Appeal Decision, As Applicable Statute of Limitations Necessitated Commencement of This Action.

Plaintiff filed the instant matter on March 21, 2019, as required by the applicable statute of limitations. The statute of limitations on Plaintiff's first, second and third causes of action expired no earlier than April 27, 2019, two years from the date of issuance of the Summary Administrative Review, necessitating the initiation of this federal action. Accordingly, Plaintiff respectfully requests that, should this Court determine that the matter has not yet been judicially exhausted at the state court level, that this action be stayed until a decision has been reached by the Court of Appeal.

## III. PLAINTIFF PLAUSIBLY ALLEGES ERRONEOUS OUTCOME AND SELECTIVE ENFORCEMENT UNDER TITLE IX.

### A. Standard of Review.

In deciding a motion to dismiss under Fed. Rule of Civ. Proc. 12(b)(6), this Court follows the standard of review articulated by *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, *Ashcroft v. Iqbal* (2009) 556 U.S. 662, and their progeny. Specifically: "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" (*Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 570.) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Iqbal*, 556 U.S. at 678.) The court must, at this pleading stage, (1) construe the complaint in the light most favorable to Plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. (See *Sprewell v. Golden State Warriors* (9th Cir.2001) 266 F.3d 979, 988, amended on denial of reh'g, 275 F.3d 1187 (9th Cir.2001); *Pareto v. F.D.I.C.* (9th Cir.1998) 139 F.3d 696, 699.)

### B. The *McDonnell Douglas* Burden-Shifting Framework Applies.

This Court has explicitly adopted the *McDonnell Douglas Corp. v. Green* ((1973) 411 U.S. 792) burden shifting framework used in Title VII discrimination cases into Title IX jurisprudence. As recognized by the court in *Doe v. Regents of the University of California* (C.D. Cal. June 8, 2017) 2017 WL 4618591, at *14, rev'd sub nom. on other grounds *Doe v. Regents* (9th Cir. 2018) 891 F.3d 1147, "[a]lthough *Columbia* did not fundamentally alter the framework established in *Yusuf* it clarified and refined the standards a plaintiff must meet to plausibly state a Title IX claim under the requirements of *Iqbal* and *Twombly*. Most significantly, *Columbia* explicitly adopted the *McDonnell Douglas* burden-shifting framework used in Title VII cases into Title IX jurisprudence..."

In *Doe v. Columbia Univ.* (2d Cir. 2016) 831 F.3d 46, the Second Circuit applied by analogy the framework of shifting burdens of proof of discriminatory intent that courts apply in Title VII employment cases, stating "the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well. Thus, a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia*'s adoption of the burden shifting framework under *McDonnell Douglas* means a "minimal burden" is required at the pleading stage when alleging gender based discriminatory intent. (*Doe v. Columbia*, 831 F.3d at 54-55.) As "smoking gun" proof of discrimination is rare, circumstantial evidence may satisfy the *McDonnell Douglas* test. (*See Lyons v. England* (9th Cir. 2002) 307 F.3d 1092, 1112 ("Absent direct evidence of discrimination, a Title VII plaintiff may prove his case through circumstantial evidence, following the burden-shifting framework established in *McDonnell Douglas Corp…*"); *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 552.

The Ninth Circuit has defined the Title VII employment discrimination framework espoused in *McDonnell Douglas Corp. v. Green* in this way: "when the plaintiff

---

demonstrates his prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action…If the defendant meets this burden, then the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons ... are mere pretext for unlawful discrimination."" *Reynaga v. Roseburg Forest Prod.* (9th Cir. 2017) 847 F.3d 678, 691. A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." (*DeJung*, 169 Cal.App.4th at 553; *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 146 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination").)

Plaintiff will present a *prima facie* case that (1) he is male, (2) he was not responsible for the violations for which he was sanctioned, (3) he was found responsible and sanctioned, (4) the outcome of the proceeding was not accurate, and (5) he has some evidence of gender bias. If Plaintiff meets this initial burden, Defendants have the burden of articulating a nondiscriminatory reason for the adverse action (in this case, finding Plaintiff responsible). If USC meets its burden, then Plaintiff has the burden to prove that USC's reason was a "pretext for discrimination." In proving that Defendants' stated reason was a "pretext for discrimination," and the decision motivated by gender bias against males, Mr. Boermeester will present evidence of external and internal pressures on USC to aggressively discipline males, specific discriminatory statements and presumptions made by decisionmakers about male athletes, and substantial procedural errors that led to an erroneous conclusion contrary to the weight of evidence.

### C. Erroneous Outcome.

To establish a violation of Title IX under an "erroneous outcome" theory, a

---

plaintiff must show (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. (See *Yusuf v. Vassar Coll.* (2d Cir. 1994) 35 F.3d 709, 715.) As set forth below, the Complaint plausibly alleges that there were significant flaws in the disciplinary proceeding, which cast doubt on the outcome of the University's proceeding as a whole, and that the finding of responsibility and the decision to expel Plaintiff was motivated by gender bias.

### 1.   *Facts Cast Articulable Doubt on Accuracy of the Outcome.*

A plaintiff may cast articulable doubt on the outcome of university sexual misconduct proceedings by, *inter alia*: pointing to procedural flaws in the adjudication processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of evidence. (See *Doe v. Marymount Univ.* (E.D. Va. Mar. 14, 2018) 297 F.Supp.3d 573, 584; see also *Yusuf*, 35 F.3d at 715.) A university's denial of the opportunity for cross-examination before the factfinder in a case where credibility is at stake is also a fact sufficient to cast articulable doubt on the accuracy of the outcome. (*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 585-586.)

Plaintiff alleges that the University reached an erroneous outcome when it found him responsible for "Intimate Partner Violence", because he was in fact innocent of the charges. (Complaint, ¶ 169). The Complaint details how significant procedural flaws in the investigation process led to the incorrect outcome, despite the lack of evidence supporting the finding and the presence of information disputing the charges:

- Ms. Katz repeatedly affirmed to USC that she had not experienced any prohibited conduct. (Complaint, ¶ 47; *see also* PL RJN, Exh. 5).

- USC pursued an investigation against Mr. Boermeester after receiving a third-party complaint from a non-witness mandated reporter, despite the alleged victim repeatedly affirming that he did not engage in any misconduct. (Complaint, ¶ 171).

- USC presumed Mr. Boermeester guilty from the outset when it imposed an interim suspension, prior to meeting or speaking with him, and when it removed his tuition scholarship from his financial account. (Complaint, ¶ 171).

- USC deprived Mr. Boermeester of a meaningful opportunity to be heard when its policies did not allow for a hearing before a panel of impartial decisionmakers. (Complaint, ¶ 171).

- USC deprived Mr. Boermeester of the opportunity to challenge and question adverse witnesses despite the Investigators' reliance on the summaries of various non-party witness "statements." (Complaint, ¶ 171).

- USC did not attempt to contact or interview witnesses identified by Mr. Boermeester but instead relied on witnesses who had no independent knowledge of the events at issue or the parties' relationship. (Complaint, ¶ 171).

- USC treated Ms. Katz as a "battered woman" whose repeated denials that Mr. Boermeester had engaged in any wrongdoing were disregarded on the assumption that such denials were a response to the trauma she had endured. (Complaint, ¶ 171).

- USC referred to Mr. Boermeester as an "all-star football player" and told Ms. Katz that a "Baylor situation" was not going to happen at USC and they (at the Title IX office) knew "how to deal with football players." (Complaint, ¶ 171).

- USC imposed an Avoidance of Contact Order that neither party desired, using the discriminatory justification that it needed to keep Ms. Katz "safe" from Mr. Boermeester, and failed to consider lifting it despite the requests from both parties and their counsel. (Complaint, ¶ 171).

- USC failed to document and excluded from evidence the exculpatory evidence of Dahlinger Means' physical examination of Ms. Katz that revealed no sign of any injury. (Complaint, ¶ 171).

- USC failed to consider additional exculpatory evidence including the testimony of both Mr. Boermeester and Ms. Katz, security camera footage, the testimony of multiple witnesses who reported they never saw any act of violence between the parties and that they were often physical in a playful way. (Complaint, ¶ 171).

- Defendants included in the Summary Administrative Review inculpatory evidence purportedly provided by Witness L.M., even though the Investigators never actually spoke with L.M. (Complaint, ¶ 171).

- USC improperly afforded greater weight to the hearsay testimony of witnesses, who had no independent knowledge of the alleged interaction and who were never interviewed in person, than to the involved parties themselves. (Complaint, ¶ 171).

- USC prevented Mr. Boermeester from presenting a full defense when it refused to

withdraw the Avoidance of Contact Order, prohibiting him from speaking with the one witness who had first-hand knowledge of the interaction at issue, Ms. Katz. (Complaint, ¶ 94).

The foregoing demonstrates how an incorrect finding was reached, despite clear evidence that Mr. Boermeester did not engage in misconduct at any time. Thus, Plaintiff has satisfied the first element of his Title IX claim and satisfies his initial burden of production under the *McDonnell Douglas* framework.

### 2. *Gender Bias Was A Motivating Factor.*

There is no specific formulation through which to adequately plead gender bias, pre-discovery, in an intentional discrimination case. Instead, gender bias may be proven *inter alia* through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender.[3] (*Yusuf*, 35 F.3d at 715; see also *Doe v. Miami Univ.* (6th Cir. 2017) 882 F.3d 579, 592-93; *Doe v. Columbia*, 831 F.3d at 57.) Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." (*Doe v. Marymount*, 297 F.Supp.3d at 586.) Moreover, "[w]here the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side," it may be inferred that the evaluator has been influenced by bias. (*Doe v. Columbia*, 831 F.3d at 57.)

Contrary to Defendants' contention, the allegations of the Complaint are far from speculative. Plaintiff specifically connects the erroneous finding against him to a bias against males.[4] As detailed below, taking the allegations of the Complaint as true, and drawing all reasonable inferences in Plaintiff's favor, when considering the totality of the

---

[3] Discovery is required to determine whether a university has engaged in a pattern of decision making that tends to show the influence of gender. Universities, including USC, do not publish statistics concerning the outcomes of sexual misconduct proceedings or the gender of those students who have been found responsible and sanctioned.

[4] Defendants' attempt to distinguish "Intimate Partner Violence" and "Sexual Misconduct" is unavailing. Both are prohibited conduct and investigated under the same USC policy and procedures as all other forms of "sexual misconduct."

1   circumstances, Plaintiff sufficiently raises a plausible inference that the outcome of his

2   disciplinary proceeding was motivated by gender bias. (See *Doe v. Washington & Lee U.*

3   (W.D. Va. Aug. 5, 2015) 2015 WL 4647996 at \*10.)

### a. *Evidence of External Pressure on USC, and Dahlinger Means, to Address Sexual Assault Allegations is Sufficient to Create Plausible Inference of Gender Bias.*

Courts around the country have recognized that evidence of external pressures on a

university to aggressively handle sexual misconduct cases is one factor that may

demonstrate gender biased decision-making. Specifically, evidence that a university has

been placed under federal investigation, criticized for its failure to protect female sexual

assault victims, or is under pressure to correct its perceived tolerance of the sexual assault

of female students provides a "backdrop that, when combined with other circumstantial

evidence of bias in [plaintiff's] specific proceeding, gives rise to a plausible claim [of

bias]." (*Doe v. Baum*, 903 F.3d at 586; see also *Neal v. Colo. State University-Pueblo* (D.

Colo. Feb. 16, 2017) No. 16-cv-873, 2017 WL 633045, \*12 (allegations that university

under OCR pressure to enforce "Dear Colleague Letter" in a gender-skewed manner

sufficient to plead gender bias); *Doe v. Miami*, 882 F.3d at 592-93 (plausible inference of

gender bias where inter alia university faced pressure to zealously "prosecute" male

respondents after facing lawsuit by female student); *Doe v. Columbia*, 831 F.3d at 58

(gender bias inferred where university was motivated to accept female accusation of

sexual assault and reject male's claim of consent to avoid further public criticism that it

did not protect female students).)

In his Complaint, Plaintiff details numerous sources of external pressure imposed

on USC which impacted the finding in his case. First, it is no secret that universities,

including USC, have been under tremendous pressure since the issuance of the 2011 Dear

Colleague Letter to aggressively prosecute males accused of misconduct. (Complaint, ¶

172). As a recipient of approximately $500 million annually in federal funding, USC

acted to ensure compliance with federal guidance, and avoid potential de-funding

penalties. (Complaint, ¶ 172). Second, while Mr. Boermeester's case was ongoing, USC

was under investigation by OCR for complaints related to its alleged mishandling of sexual misconduct cases. (Complaint, ¶¶ 182-184). The first was filed by the Student Coalition Against Rape on behalf of students and staff members in May 2013. The second was filed in March 2016 by an individual with similar allegations.[5] (Complaint, ¶¶ 183-184). These complaints garnered publicity and media attention and ultimately resulted in a Voluntary Resolution Agreement on March 12, 2018. (Complaint, ¶ 186). The Complaint points out that the initiation of the OCR investigations perpetuated an anti-male atmosphere at USC where male students are treated as perpetrators who must be disciplined. (Complaint, ¶ 189).

Moreover, Dahlinger Means herself has been the subject of considerable criticism, both internally within USC, and from the national media since arriving at USC in January 2016. (Complaint, ¶ 140). In a recent Los Angeles Superior Court decision post-dating the Superior Court decision on Mr. Boermeester's Petition, Judge Elizabeth Allen White ordered USC to vacate its disciplinary findings against a student when she found that statements made by Dahlinger Means demonstrated "an unacceptable probability of actual bias in the manner in which the hearing was conducted" and concluded Dahlinger Means "held an adversarial position in relation to Petitioner, rendering her advisory role…improper." (*Doe v. Ainsley Carry, et al.* (June 28, 2018) Case No. BS163736).This finding stemmed from Dahlinger Means' acknowledgement that she referred to the accused male student and his advisor as "motherfuckers", questioning "Who do those motherfuckers think they are?" and "Does that college motherfucker know who I am?" while describing the female complainant as "cute" and "a catch". While Defendants seek to distinguish the findings related to Dahlinger Means' demonstrated bias from her actions in Mr. Boermeester's case, Judge White astutely noted the impact such findings would have on future cases brought against USC by similarly situated individuals, declaring "such institutional bias exists, which will confer a benefit upon the class of

---

[5] USC is also currently the center of a maelstrom of credible allegations regarding its retention of doctors *with known, documented histories of sexual abuse of students.*

1  persons at USC accused of violating USC's sexual misconduct policy where a Title IX

2  investigation is conducted." (Complaint, ¶¶ 141-144). Further actions taken by Dahlinger

3  Means in this matter, as discussed in detail below, reveal her gender biased approach was

4  not limited to the *Doe v. Ainsley Carry* matter. The foregoing examples of the external

5  pressures placed on USC in general, and on Dahlinger Means in particular during Mr.

6  Boermeester's case, is sufficient to raise a plausible inference of gender bias.

   ### b. *Dahlinger Means Demonstrated Bias Against Plaintiff as a Result of His Status as a Male Athlete.*

8         Defendants' claim that allegations made about football players (as opposed to all

9  men in general) do not suggest gender bias is nonsensical and ignores reality—the

10 majority of football players are male, and indeed all football players at USC are male.

11 During Ms. Katz's first coerced meeting with Dahlinger Means and Helsper on January

12 23, 2017, Dahlinger Means referenced Baylor University's prior mishandling of sexual

13 assault allegations against members of its football team, stating something to the effect of

14 "We know how to handle football players."[6] (Complaint, ¶ 52). Against the express

15 wishes of Ms. Katz, USC then opened an investigation into the allegations made by a

16 third-party, non-witness reporter, against Mr. Boermeester, informed by archaic

17 stereotypes that male athletes are aggressive, violent and hypermasculine. (Complaint, ¶¶

18 131-132; PL RJN, Exh. 5). For instance, at the beginning of Mr. Boermeester's first and

19 only meeting with USC's Title IX Office on January 30, 2017, Helsper referred to Mr.

20 Boermeester as an "all-star football player" and noted his status as such would play no

21 role in the Title IX process. (Complaint, ¶ 77). Dr. Carry also cited to Mr. Boermeester's

22 "high profile" status as a football player, as a factor justifying the expulsion, that the

23 appellate panel had soundly rejected as grossly disproportionate, in the decision letter

24

---

26 [6] This reference alludes to the report of a former Baylor volleyball player who alleged the
   University mishandled her complaint of having been gang-raped by up to eight Baylor
27 football players in 2012. *See* http://www.espn.com/college-
   football/story/_/id/24090683/baylor-university-settles-title-ix-lawsuit-which-gang-rape-
28 8-football-players-was-alleged

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

1  dated July 7, 2017. (Complaint, ¶ 120). The mere fact that his student athlete status was

2  mentioned both during Mr. Boermeester's first meeting, and in the expulsion decision,

3  notwithstanding its irrelevance to either the allegations made or the applicable

4  procedures, reveals the impact that this athlete status had on the investigation and the

5  investigators' handling of the investigation from the outset.

6        Furthermore, USC chose to make an example of Mr. Boermeester, by

7  demonstrating publicly USC's harsh stance against male students, particularly athletes,

8  accused of misconduct. (Complaint, ¶ 156). Specifically, despite the policies'

9  confidentiality provisions, on February 7, 2017, the existence of an investigation against

10  Mr. Boermeester was leaked to the national media. USC issued a press release in

11  response, publicly declaring Mr. Boermeester had been removed from the USC football

12  team and had been indefinitely suspended during the investigation. (Complaint, ¶ 97).

13  Similarly, in direct violation of its obligations with respect to Mr. Boermeester's privacy

14  and confidentiality in the Title IX process, USC publicly announced shortly after Dr.

15  Carry's July 7, 2017 expulsion decision: "Placekicker Matt Boermeester, whose 18 field

16  goals last year—including a 46-yarder at the gun to win the Rose Bowl—were 1 shy of

17  the school record, won't return because of a student code of conduct issue." (Complaint,

18  ¶ 121). The initial public statement was made while two OCR cases were pending against

19  USC and during a national dialogue about campus sexual assault. USC conducted its

20  prosecution of Mr. Boermeester and imposed the harshest sanction possible to

21  demonstrate an exacting stance against males accused of misconduct, alerting the public

22  in a national press release to its ultimate decision five months later. (Complaint, ¶ 121)

       **c.** ***Dahlinger Means Demonstrated Bias Against Plaintiff by Treating Ms.***
23     ***Katz as a Victim Despite Ms. Katz's Repeated Denials of Wrongdoing.***

24        Plaintiff further demonstrates the plausibility of his gender bias claims in

25  articulating how Defendants treated the female student as a battered victim who required

26  the University's protection, despite Ms. Katz's repeated statements that she had not been

27  subjected to any misconduct, and despite her repeated requests that the investigation not

28  move forward. (See PL RJN, Exh. 5). From the outset, Mr. Boermeester was treated as a

perpetrator, while Ms. Katz was mischaracterized as a traumatized "battered woman." Utilizing a trauma-informed investigative approach, Dahlinger Means presumed Ms. Katz to be a victim whose denials of Mr. Boermeester's wrongdoing were a response to the trauma she suffered. (Complaint, ¶¶ 73, 136; PL RJN, Exh. 5).

Due to the "dismissive and demeaning manner" in which Ms. Katz was treated, she retained her own attorney during the investigation to protect her rights. On July 30, 2017, after USC's Title IX process had concluded, she issued a public statement concerning the mistreatment she had endured at the hands of Dahlinger Means and Helsper through their investigation process. (Complaint, ¶¶ 122-123; PL RJN, Exh. 5).

Defendants' argument that the assertion Ms. Katz was treated poorly somehow undermines Plaintiff's allegations of gender bias misinterpret Plaintiff's claim—both Plaintiff and Ms. Katz were subjected to stereotypical gender norms based on archaic presumptions about the roles of men and women in relationships. (Complaint, ¶ 14).

Ultimately, Mr. Boermeester was found responsible and expelled because he is a male; as both parties were adamant that Mr. Boermeester never engaged in any conduct violative of USC's policies, there is no other logical explanation for the ultimate outcome. Given the external and internal pressures on USC to aggressively discipline male students, specific discriminatory statements and presumptions made about male athletes, and the procedural errors made including reaching an erroneous conclusion that was contrary to the weight of evidence, Plaintiff has articulated "some minimal evidence suggesting an inference that [Defendants] acted with discriminatory motivation," giving rise to a plausible inference that the Defendants' actions were the result of gender bias. (*Doe v. Columbia*, 831 F.3d at 54.) Thus, Plaintiff has presented a *prima facie* showing of a Title IX violation under the *McDonnell Douglas* Framework.

### D. Selective Enforcement.

To demonstrate entitlement to relief on a Title IX Selective Enforcement claim, a plaintiff must establish "that regardless of his guilt or innocence, the severity of punishment was affected by Plaintiff's gender." (*Doe v. Regents of the Univ. of*

---

1  *California* (C.D. Cal. Dec. 14, 2015) No. 215CV02478SVWJEM, 2015 WL 13755510, at
2  *4, citing *Yusuf*, 35 F.3d at 715.) In his Complaint, Plaintiff demonstrates he was treated
3  more harshly, and disciplined more aggressively than other students because he is a male,
4  and because he was a prominent athlete. First, USC's decision to initiate the investigation
5  against Mr. Boermeester, over Ms. Katz's objections and repeated denials of wrongdoing,
6  was affected by his gender. During its investigation, USC intentionally discriminated
7  against Mr. Boermeester when it imposed an unwarranted interim suspension that was in
8  effect an expulsion prior to any investigation being performed, presumed him to be
9  responsible for the alleged misconduct based on archaic stereotypes about males and
10  particularly male athletes, permitted a Title IX Coordinator who had previously
11  demonstrated a bias against males to act as investigator, judge, jury and executioner, and
12  permitted the Title IX Coordinator, a former sex crimes prosecutor, to take an adversarial
13  role against a student USC was obligated to treat fairly. (Complaint, ¶ 199).

14      Further, Plaintiff provides specific allegations, that are far from conclusory, to
15  demonstrate the University imposed a harsher sanction because of his status as a well-
16  known male athlete on campus. Helsper referred to Mr. Boermeester as an "all-star
17  football player" during their first and only meeting on January 30, 2017, Dahlinger
18  Means referenced Baylor University's prior mishandling of sexual assault allegations
19  against members of its football team, assuring Ms. Katz that "[USC knows] how to
20  handle football players", USC publicly announced his removal from USC due to a
21  conduct issue which permanently and irreparably damaged his reputation, and when
22  arbitrarily increasing the sanction from a two-year suspension to a permanent expulsion,
23  Dr. Carry cited to Mr. Boermeester's "high profile" status as a football player, as a factor
24  justifying the sanction, which the appellate panel had rejected as grossly disproportionate.
25  (Complaint, ¶¶ 120, 260). Based on the foregoing, Plaintiff believes that USC possesses
26  additional documentation demonstrating its unlawful pattern of aggressively punishing
27  males, particularly male athletes, in comparison to females. (Complaint, ¶ 190).

28  **IV.    DEFENDANTS WERE ENGAGED IN STATE ACTION.**

---

1       Defendants argue for dismissal of Plaintiff's 42 U.S.C. § 1983 claim on the

2   grounds that courts have generally declined to find state action in the context of a private

3   university's student conduct proceedings. However, "[w]hether a private party engaged in

4   state action is a highly factual question." (*Heineke v. Santa Clara Univ.* (N.D. Cal. Dec.

5   5, 2017) No. 17-CV-05285-LHK, 2017 WL 6026248, at *15.) In his Complaint, Plaintiff

6   details how the actions of the Defendants in adjudicating Mr. Boermeester's case

7   transformed their conduct into state action. Beyond the mere receipt of federal funding,

8   or the general statements made by Secretary DeVos about the coercive nature of the Dear

9   Colleague Letter, USC acted in direct response to the federal government's threat that

10  colleges refusing to comply with the mandates of the DCL would be found in violation of

11  Title IX and subject to de-funding penalties. (Complaint, ¶ 216). In addition, Plaintiff

12  plausibly alleges state action pursuant to the "public function" test, when USC

13  adjudicated an allegation of intimate partner violence, a function that is traditionally

14  governmental in nature and delegated to the State. (Complaint, ¶ 214).

15      Significantly, in arguing for dismissal of Plaintiff's federal claims on exhaustion

16  grounds, Defendants seek to take advantage of the state statutory procedure requiring

17  Plaintiff to file a writ of mandamus in Superior Court before commencing a federal

18  action. Yet, Defendants seek to avoid "state actor" status pursuant to 42 U.S.C. §1983 in

19  carrying out its internal disciplinary procedures. Defendants cannot have it both ways.

20  Should Defendants seek the benefit of a state court proceeding (to delay or secure

21  dismissal of a plaintiff's federal clam), it cannot simultaneously deprive Plaintiff of the

22  procedures mandated by the state courts in carrying out its grievance process.

23      Almost a year after the superior court issued its decision on Mr. Boermeester's

24  Petition, the California Court of Appeal, Second District confirmed the procedures that

25  must be afforded a student facing disciplinary sanctions at a private university when the

26  decision requires a factual determination as to whether the conduct occurred. In *Doe v.*

27  *Allee* (2019) 30 Cal.App.5th 1036, the Court found that USC's disciplinary procedure

28  failed to provide a fair hearing because USC's procedure failed to provide a mechanism

---

for effective cross-examination of the accuser and adverse witnesses before an independent factfinder. (Complaint, ¶ 241). Similarly, in *Doe v. Ainsley Carry, et al.* (Cal. Ct. App. Jan. 8, 2019) No. B282164, 2019 WL 155998, at *1, the Court set aside the University's disciplinary finding, concluding USC failed to provide the plaintiff with a fair disciplinary hearing when no in-person hearing was held, the single investigator acted as prosecutor and tribunal, and the accused was not provided a right to cross-examination. (Complaint, ¶ 244). (See also *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212.) Similarly, here, Mr. Boermeester was not provided the opportunity to present his case at a live hearing before an impartial tribunal, nor to challenge the reliability of witness statements through cross-examination. (Complaint, ¶ 245). Accordingly, USC failed to provide Mr. Boermeester the requisite level of process dictated by California's Court of Appeal. Defendants cannot in good faith contend that they were not required to afford Plaintiff the procedural protections outlined by the Court of Appeal, yet seek to benefit from the Superior Court's decision on Plaintiff's Petition. In requiring Plaintiff to pursue the state court remedy of a writ of mandamus, and seeking to enforce the Superior Court's decision on Plaintiff's Petition, Defendants are transformed into "state actors" who were thus required to provide the requisite level of procedural due process protections in a University student conduct proceedings.

## V.   MOTION TO STRIKE OR DISMISS FOURTH, FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTION FOR DAMAGES MUST BE DENIED.

Plaintiff has no substantive quarrel with USC's recitation of well-established California law regarding the anti-SLAPP statute. Plaintiff does, however, point out the potential chilling effects of an overbroad reading of the anti-SLAPP statute:

> An unduly broad reading of the anti-SLAPP statute "would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike. Any employer that initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee, who, without the benefit of discovery and with the threat of attorney fees looming, would be obligated to demonstrate the likelihood of prevailing on the merits. Such a result is at odds with

---

the purpose of the anti-SLAPP law, which was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award." (*Nam*, *supra*, 1 Cal.App.5th at p. 1189.) *Laker v. Bd. of Trustees of California State Univ.* (Ct. App. 2019) 244 Cal.Rptr.3d 238, 257.

### A. Defendants Fail to Make a Prima Facie Showing That Plaintiff's Claims Arise from Protected Activity.

Plaintiff agrees USC's Title IX investigation likely qualifies as an "official proceeding authorized by law" under the anti-SLAPP statute. Plaintiff takes issue with Defendants' bewildering assertion that all activity in connection with a university Title IX proceeding, including the adjudication itself, is protected activity shielded from litigation by the anti-SLAPP statute. Such contention vastly overstates the law.

In *Kibler v. N. Inyo Cty. Local Hosp. Dist.* (2006) 39 Cal.4th 192, for instance, a hospital's peer review committee summarily suspended Dr. George Kibler. (*Kibler*, 39 Cal.4th at 196.) Dr. Kibler sued the hospital, nurses, and physicians for defamation, abuse of process, and interference with Dr. Kibler's practice of medicine. (*Id.*) The defendants moved to strike the complaint as a SLAPP suit. (*Id.* at 197.) The issue in *Kibler* was whether the hospital's peer review process was an "'official proceeding authorized by law' within the meaning of section 425.16 and thus subject to a special motion to strike as a SLAPP suit." (*Id.*) The trial court and Court of Appeal agreed, "[A] lawsuit arising out of a peer review proceeding is subject to a special motion under section 425.16 to strike the SLAPP suit." (*Id.* at 198.) The *Kibler* Court did not hold that all activity during the peer review proceedings, nor the peer review proceeding itself, was "protected activity" within the meaning of the anti-SLAPP statute. In fact, the *Kibler* Court declined to evaluate whether the peer review proceedings qualified as "'conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'" (*Id.* at 203.)

Likewise, in *Laker*, a student reported to Dr. Laker that a university department

---

chair, Dr. Lewis Aptekar, had sexually and racially harassed her. (*Laker*, 244 Cal.Rptr.3d at 247.) Following a finding that Dr. Aptekar had engaged in the alleged conduct, Dr. Aptekar and other faculty members brought administrative complaints against Dr. Laker, and investigations ensued. (*Id*. at 248.) Dr. Laker filed a lawsuit against the university and its administrators for defamation and retaliation. (*Id*.) As to the defamation claim, Dr. Laker alleged he was falsely accused by defendants when they stated that he "knew of sexual harassment and failed to report it," and when other university officials called him a "liar." (*Id*.) As to the retaliation claim, Dr. Laker alleged *inter alia*, that the university retaliated against him by carrying out groundless investigations. (*Id*. at 248-249.)

The *Laker* Court found Dr. Laker's defamation cause of action arose from witness statements made during or in connection with the Title IX investigation and were thus protected by the anti-SLAPP statute. (*Id*. at 254, 256-258 ("defamation claims necessarily involve speech and are therefore more commonly found to be SLAPPs.")) In contrast, the Court found the retaliation cause of action arose from "the University's decision to pursue the investigations—rather than any particular statement made in the course of that investigation—and its decision to 'red flag' him." (*Id*. at 263.)

Defendants fail to satisfy the requisite *prima facie* showing. Defendants argue Plaintiff's fourth through seventh causes of action are subject to a special motion to strike pursuant to Code Civ. Proc. § 425.16 because the causes of action arise from acts in furtherance of Defendants' right of petition or free speech described in Code Civ. Proc. § 425.16 subd. (e) subparagraphs (1) and (2). However, Defendants fail to identify any "written or oral statement or writing made before a legislative, executive or judicial proceeding, or any other official proceeding authorized by law," or "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" at issue in this action potentially qualifying for protection. Defendants' assertion that USC's Title IX investigation itself is a protected activity, and therefore all speech and conduct in connection with the Title IX investigation is shielded from litigation is

---

contrary to established legal authority: "Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them "would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power."" (*Laker*, 244 Cal.Rptr.3d at 262, quoting *Park v. Bd. of Trustees of California State Univ.* (2017) 2 Cal.5th 1057, 1067.)

### B. Claims for Relief Do Not Arise from Act in Furtherance of a Person's Right of Petition or Free Speech.

"The first step of the anti-SLAPP analysis 'turns on two subsidiary questions: (1) What conduct does the challenged cause of action "arise[] from"; and (2) is that conduct "protected activity" under the anti-SLAPP statute?'" (*Laker*, 244 Cal.Rptr.3d at 251.) "The Supreme Court has clarified that 'arising from' means 'based on.'" (*Id*.) "[A] claim may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, 2 Cal.5th at 1060.) "To determine whether the speech constitutes the wrong itself or is merely evidence of a wrong, 'in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.'" (*Id*. at 254.) The statutory elements of Plaintiff's fourth through seventh causes of action do not include any statements or other communicative conduct at all, much less any speech or petitioning conduct that is protected under Code Civ. Proc. § 425.16 subd. (e). Plaintiff's causes of action, therefore, do not arise from protected activities.

### 1. *Plaintiff's Fourth Cause of Action for Breach of Contract Does Not Arise from Protected Activity.*

The elements of a breach of contract claim are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th

915, 921.) Mr. Boermeester alleges in his fourth cause of action against USC[7] that a contractual relationship existed between him and USC through the act of matriculation and payment of tuition and fees, and through written documents and policies provided to students (Complaint, ¶¶ 253-260); Mr. Boermeester performed his obligations under the contract (Complaint, ¶ 256); USC committed multiple breaches of its agreements with Mr. Boermeester during the investigation and adjudication process by failing to abide by university procedures (Complaint, ¶¶ 260-263); and Mr. Boermeester sustained damage as a result of USC's breaches.  (Complaint, ¶¶ 264-265).

The cause of action arises from USC's breaches of contracts, not from statements or protected activity. USC has not exercised any constitutional right of free speech or petition by investigating claims filed by a third-party reporter. As Defendants contend, investigations are mandated by Cal. Educ. Code § 67386. There is no right of free speech, nor communicative conduct whatsoever, that can be the subject of Defendants' anti-SLAPP argument. Any speech mentioned in the complaint does not form the basis for a breach of contract cause of action and merely provides context and evidentiary support for Plaintiff's claims. (See *Laker*, 244 Cal.Rptr.3d at 261 ("'[a]llegations of protected activity that merely provide context, without supporting a claim for recovery' are not subject to section 425.16 and 'cannot be stricken under the anti-SLAPP statute.'"))

### 2.   *Plaintiff's Fifth Cause of Action for Promissory Estoppel Does Not Arise from Protected Activity.*

The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." (*US Ecology, Inc. v. State of California* (2005)

---

[7] "Although the text of section 425.16 does not distinguish between claims arising from the protected conduct of individuals from those arising from the protected conduct of governmental entities, we observe that courts appear more likely to find that claims arise out of protected conduct when they are based on the actions of *individuals*."  (*Laker*, *supra*, 244 Cal.Rptr.3d at 264, emphasis added.)

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

129 Cal.App.4th 887, 901.) Plaintiff alleges in his fifth cause of action against USC that USC's policies and offer of admission constitute representations and promises that USC should have reasonably expected to induce action or forbearance by Mr. Boermeester (Complaint, ¶ 267); Mr. Boermeester relied to his detriment on USC's promises and representations (Complaint, ¶ 269); USC expected or should have reasonably and foreseeably expected Mr. Boermeester to rely on its promises that USC would not discriminate against him or deny him procedural rights (Complaint, ¶ 268); and Mr. Boermeester sustained damages  as a result of his reliance. (Complaint, ¶ 271).

The Complaint does not allege any communicative speech or conduct by USC that qualifies for protection under the anti-SLAPP statute, and Defendants do not contend that it does. The cause of action arises from Plaintiff's reasonable and foreseeable reliance on promises made to him through its various university policies and USC's offer of admission, not from statements or protected activity made during or in connection with the Title IX investigation. (See *Park*, 2 Cal.5th at 1063 ("the mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute."))

### 3. *Plaintiff's Sixth Cause of Action for Negligence Does Not Arise from Protected Activity.*

"In order to establish liability on a negligence theory, a plaintiff must prove duty, breach, causation, and damages." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) Plaintiff alleges in his sixth cause of action that a special university-student relationship existed between him and Defendants, giving rise to "a duty to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict, and to ensure proper training to those responsible for investigating and adjudicating the alleged policy violations" (Complaint, ¶¶ 275-277); Defendants breached their duties by failing to provide the full protections of the disciplinary process and subjecting Mr. Boermeester to a biased and defective procedure, and USC further breached the duty by failing to remedy Defendant Dahlinger Means' known bias

---

(Complaint, ¶¶ 278-279); and Mr. Boermeester suffered injuries as a direct result of Defendants' breaches. (Complaint, ¶ 280). The cause of action arises from Defendants' breaches of duties in conducting disciplinary proceedings with due care, free of bias. There is no communicative conduct at the heart of Plaintiff's sixth cause of action.

### 4. *Plaintiff's Seventh Cause of Action for IIED Does Not Arise from Protected Activity.*

"A cause of action for intentional infliction of emotional distress exists when there is '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.) Plaintiff alleges in his seventh cause of action that Defendants exhibited extreme and outrageous conduct by suspending him, removing him from campus, pursuing an investigation against the wishes of the alleged "victim," and conducting a procedurally unfair and one-sided adjudication. (Complaint, ¶¶ 283-285). Mr. Boermeester further alleges that he suffered severe and extreme emotional, and Defendants' actions were the actual and proximate cause of his distress. (Complaint, ¶ 286). As in *Laker*, the cause of action arises not from speech or communicative conduct, but from Defendants' decisions to investigate and adjudicate the false allegations. (*Laker*, 244 Cal.Rptr.3d at 262 ("What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration."))

### C. Plaintiff Has Alleged Entitlement to Relief.

"If the defendant prevails in [the first] step of the analysis, the trial court must then assess the merits of the plaintiff's claim. The Supreme Court has described this second step of the SLAPP analysis as a 'summary-judgment-like procedure.' The plaintiff carries the burden of demonstrating that its claim has 'at least "minimal merit."'" (*Laker*, 244 Cal.Rptr.3d at 261, citations omitted.) As shown, a genuine issue of material fact exists,

and Defendants have not shown that Plaintiff's fourth through seventh causes of action will be unsuccessful, even if all allegations are accepted as true. Defendants argue only that Mr. Boermeester cannot prevail on his claims because he has failed to exhaust administrative remedies. As addressed, Plaintiff's fourth through seventh causes of action seek damages and do not challenge the result of USC's flawed administrative process. Even assuming USC's contention regarding exhaustion has a scintilla of merit, that is dispelled by the allegations of the complaint that make it clear that further attempts to deal with USC would be futile in light of its slanted, results-oriented administrative process and litigation demeanor in court. (*See*, *e.g.*, Complaint, ¶¶ 13-16, 48-51, 58, 67-72, 82-84, 92-97, 197, 113.)

### D. USC Offers Zero Basis For Dismissal.

As discussed above, USC's exhaustion argument is fatally flawed and does not form a valid basis for dismissal. USC's phoned-in motion to dismiss the fourth through seventh causes of action pursuant to Rule 12(b)(6) fails.

## VI.   CONCLUSION.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety. Additionally, "If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." (Code Civ. Proc. § 425.16 subd. (c)(1)).

Alternatively, should the Court determine that the matter has not yet been judicially exhausted, Plaintiff requests that this action be stayed until a decision on the appeal of Plaintiff's Writ of Mandamus has been reached by the Court of Appeal.

DATED:  May 23, 2019                          Respectfully submitted,

                                              By: _ /S/ Andrew T. Miltenberg_____.
                                              NESENOFF & MILTENBERG LLP
                                              Andrew T. Miltenberg, Esq.
                                              Stuart Bernstein, Esq.

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE

Tara J. Davis, Esq.

HATHAWAY PARKER
Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.

*Attorneys for Matthew Boermeester*

1

CERTIFICATE OF SERVICE

2

I am a citizen of the United States and employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 445 South Figueroa Street, 31st Floor, Los Angeles, CA 90071.

3

4

On May 23, 2019, I certify that I electronically filed and served the foregoing document described as PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO FRCP 12(b)(6) OR, IN THE ALTERNATIVE, TO STRIKE THE FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF PURSUANT TO CCP § 425.16 with the Clerk of the Court for the United States District Court, Central District of California and on all Participants in the case who are registered users of the CM/ ECF system by transmitting a true copy thereof:

5

6

7

8

Julie Arias Young
Karen Pazzani
Young & Zinn LLP
1150 South Olive Street, Suite 1800
Los Angeles, CA 90015
Telephone: (213) 362-1860
Facsimile: (213) 362-1861
E-mail: jyoung@yzllp.com
E-mail: kpazzani@yzllp.com
ATTORNEYS FOR DEFENDANTS

9

10

11

12

13

14

☐   BY FACSIMILE TRANSMISSION from FAX number (213) 529-0783 to the fax number set forth above. The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

15

16

☐   BY MAIL by placing a true copy thereof enclosed in a sealed envelope addressed as set forth above. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

17

18

19

☐   BY PERSONAL SERVICE by delivering a copy of the document(s) by hand to the addressee or I caused such envelope to be delivered by messenger or process server.

20

☐   BY EXPRESS SERVICE by depositing in a box or other facility regularly maintained by the express service carrier or delivering to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served.

21

22

☒   BY ELECTRONIC TRANSMISSION by transmitting a PDF version of the document(s) by electronic mail to the party(s) identified on the service list using the e-mail address(es) registered with the CM/ ECF system.

23

24

☐   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

25

26

☒   I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

27

Executed on May 23, 2019 in Los Angeles, California _____
Yesenia N. Alvarado

28

---

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE**

32